JONATHAN J. CODDINGTON, and JOSEPH C. CODDINGTON, who were impleaded in the Court below with JOHN F. RANDOLPH, and JOSIAH SAVAGE, Appellants,

*against*

THOMAS BAY, Respondent.

A person receiving negotiable paper, in the usual course of trade, for a fair and valuable consideration, from an agent or factor, having no authority to transfer them, but without knowledge of that fact, or notice of the fraud, may hold them against the true owner.

But, where *R.*, as agent, had received notes, to be remitted to his principal, and passed them to the defendant, as *security* against responsibilities assumed by him, as endorser of the notes of *R.*, and the maker of notes lent *R.*, for his accommodation, but not then payable, and the defendant had no notice or knowledge that the notes belonged to the plaintiff, but believed that they belonged to *R.*, who had become insolvent at the time he received them: *Held*, that the notes not being received in the usual course of trade, nor for a present consideration, the defendant was not entitled to hold them against the true owner.

APPEAL from the Court of Chancery. The bill, filed *June* 15, 1819, by the respondent against the appellants, stated, that in *April*, 1819, being the owner of a vessel called the *Express*, he employed *R.* & *S.*, who were merchants and copartners in trade, in *New-York*, to sell her, on a credit, and instructed them to take good approved notes in payment, and to transmit them forthwith to him, with an account of their charges, which should be immediately paid, with which instructions *R.* & *S.* engaged to comply. That *R.* & *S.* sold the vessel for 3,875 dollars, and on the 3d of *June*, 1819, received from the purchasers six promissory notes, dated *May* 5, 1819, at two, four, and six months, payable to *R.* & *S.*, or order, which they refused to deliver to the respondent. That *R.* & *S.* became insolvent, and delivered the notes to the appellants, *J. J.* & *J. C. Coddington*, who were under large advances and responsibilities for

IN ERROR.
ALBANY, Nov. 1822.
CODDINGTON v. BAY.

*R. & S.* The bill charged, that the appellants, when they received the notes of *R. & S.*, knew that they had been given in payment for the vessel belonging to the respondent, which had been sold for his account by *R. & S.* The bill prayed, that the appellants might be decreed to deliver up, and account to the respondent for the notes. The answer admitted, that *R. & S.* had stopped payment when they delivered the notes to the appellants, who admitted, that when they received the notes, *R. & S.* were not actually indebted to them, otherwise than that they were under large gratuitous responsibilities for *R. & S.*, as endorsers of notes for their accommodation, payable at different times, but subsequent to the 12th of *June*, 1819, and which they were, afterwards, obliged to take up as they fell due. The appellants denied all knowledge of the manner in which the notes had come to the hands of *R. & S.*, and they alleged, that they believed them, at the time, to be the exclusive and *bona fide* property of *R & S.*, and received them, with others, to indemnify them, as far as they would avail, for their responsibilities. That three days after the notes were delivered to them, they disposed of some of them for cash; and did not know, until several days afterwards, that they belonged to the respondent, as stated in his bill. *R. & S.*, in their answer, say, that when they received the notes of the purchasers of the vessel, they gave their guaranty against any demands existing against the vessel previous to the sale, and paid her bills in *New-York*, amounting to 48 dollars and 14 cents, and that their commissions on the sale amounted to 96 dollars and 87 cents, and that they had received no counter security for their guaranty. Replications were filed to the answers, but no proofs were taken in the cause, which was brought to a hearing on the pleadings; and on the 8th of *January*, 1821, the *Chancellor* decreed, that the appellants were not entitled to the notes, or the proceeds thereof, as against the respondent, who was the lawful owner of them when they were transferred to the appellants; inasmuch as they did not receive the notes in the course of business, nor in payment, in whole, or in part, of any then existing debt, nor for cash or property advanced, or debt created, or responsibility incurred on the credit of the notes;

and he directed a reference to a master to compute the amount of the notes, with interest; and that the appellants, and *R. & S.*, or some, or one of them, pay to the respondent the sum that should be reported as the amount of the notes and interest, in thirty days after the report was filed, and notice thereof, &c.; and that *R. & S.* pay to the respondent his entire costs of suit, to be taxed, and that he give credit upon those costs for the charges and commissions due from him to *R. & S.*, on the sale of the vessel, and that the respondent have execution for the balance; but that no costs be allowed to the respondent, or the appellants, *J. J. & J. C. Coddington*, as against each other. From this decree, an appeal was entered to this Court.

The CHANCELLOR assigned his reasons for the decree; for which, see S. C. 5 *Johns. Ch. Rep.* 54—56—59.

*Van Buren*, for the appellants, contended, 1. That the notes being negotiable, and in possession of *R. & S.* as the lawful holders of them, they had a right to negotiate and pass them away, for a valuable consideration. That a *bona fide* holder of a negotiable note, without notice, is entitled to it, is too well settled to be denied; but it will be attempted, on the part of the respondent, to except the present case from the operation of the general principle. The first case on the subject, is the one decided by Lord *Holt*, (1 *Salk.* 126. *Anon.*) who held, that trover would lie against the finder of a bank bill, payable to bearer, but not against his assignee, who, by the course of trade, acquires a property in it. In *Miller* v. *Race*, (1 *Burr.* 452.) it was decided, that a bank note, though stolen, became the property of one who gives a valuable consideration for it, without notice of the fact of its being stolen. The same principle is laid down in *Grant* v. *Vaughan*, (3 *Burr.* 1516.) So, in *Peacock* v. *Rhodes*, (*Doug.* 633.) where a bill of exchange with a blank endorsement, had been stolen, and was passed to a shopkeeper, in payment for cloth, without notice, Lord *Mansfield* held, that the innocent holder was entitled to recover against the drawer. He said, "that the holder of a bill of exchange, or promissory note, is not to be considered

IN ERROR.

ALBANY, Nov. 1822.

CODDINGTON v. BAY.

in the light of an assignee of the payee." "The law is settled, that a holder, coming fairly by a bill or note, has nothing to do with the transaction between the original parties." "I see no difference between a note endorsed blank, and one payable to bearer. They both go by delivery, and possession proves property in both cases." In *Collins* v. *Martin*, (1 *Bos. & Pull.* 648.) Chief Justice *Eyre* said, "For the purpose of rendering bills of exchange negotiable, the right of property in them passes with the bills. Every holder, with the bills, takes the property, and his title is stamped on the bills themselves. The property, and the possession, are inseparable. This was necessary to render them negotiable; and, in this respect, they differ essentially from goods, of which the property and possession may be in different persons. The property passing with the possession, it is admitted, that a banker, who receives endorsed bills from his customer, to be got when due, and carried to his account, may discount or sell them; why may he not pledge them? Either is a breach of confidence reposed in him, and he may sell, because the property has been intrusted to him; and he may pledge for the same reason; for he who has the property has a disposing power, and the law has not limited it to be used in any particular manner." (1 *Bos. & Pull.* 539. 4 *Camp. N. P. Rep.* 349. 2 *Camp. N. P. Rep.* 123. 1 *Sch. & Lefr.* 345, 346. 3 *Atk.* 232. 13 *East's Rep.* 130. 135. 1 *Camp. N. P. Rep.* 557. 4 *Esp. N. P. Rep.* 56. 1 *Ld. Raym.* 713.) In *Putnam* v. *Sullivan*, (4 *Mass. Rep.* 45.) the rule has been laid as strongly in favour of the holder as in any of the *English* cases. But the Chancellor rests his decree on two grounds; 1. That the notes were not received by the appellants, in the course of trade; and, 2. That they gave no consideration for them. It is perfectly immaterial, whether the appellants received them in the course of trade or not. The true question is, whether it is necessary for them to show, that they paid a new and distinct consideration for the notes. The only inquiry is, whether the appellants came by the notes honestly, and *bona fide*. No matter what the transaction may have been between the holder and the person from whom he obtained the notes, so long as they

were received *bona fide*, and for a valuable consideration. In *Clarke* v. *Shee*, (*Cowp.* 197. 200.) Lord *Mansfield* says, "Where money or notes are paid *bona fide*, and upon a valuable consideration, they never shall be brought back to the true owner." In *Conroy* v. *Warden*, (3 *Johns. Cases*, 259. 268.) Mr. Chief Justice *Thompson* says, "I take it to be well settled, that with respect to bills of exchange and promissory notes, they, in this respect, stand on the same footing with specialties, and *prima facie*, import a consideration." In *Putnam* v. *Sullivan*, the manner in which the note had been negotiated, was not made a subject of inquiry. The course of trade is to be understood, in the broad and extensive sense of commercial policy, in regard to negotiable paper; and is not confined to a single instance of dealing. (2 *Johns. Ch. Rep.* 442. 444.)

2. We contend, that the notes were passed to the appellants, for a valuable consideration. They, however, were *bona fide* possessors of the notes, independent of the question, whether they paid a new and distinct consideration for them, at the time of the transfer. But is not an *indemnity* against responsibilities, a good and legal consideration? (2 *Johns. Ch. Rep.* 306. 4 *Johns. Ch. Rep.* 329.) It is a mistake, to suppose that the responsibilities of the appellants were *contingent* when they received the notes. The appellants had lent their own notes to *R. & S.*, to the amount of 10,000 dollars. They did not stand as mere endorsers. Their responsibility for their own notes was absolute. Besides, before they were informed of the respondent's claim, some of the notes endorsed by them had become due. In *Ex parte Bloxham*, (8 *Vesey*, 531, 532.) the acceptance of bills was held to be a good consideration. There is no essential difference between taking a note for an antecedent, or for a newly contracted debt, as regards the question of consideration. The question comes to this: who, of two honest men, shall be the sufferer by the dishonesty of a third person? The appellants and respondent are equally honest. The tree must lie as it has fallen. The money is in the possession of the appellants, and cannot be taken away from them, without showing fraud, or *mala fides*.

IN ERROR.
ALBANY, Nov. 1822.
CODDINGTON v. BAY.

*S. Jones*, contra, said, he was surprised at the assertion, that the appellants and respondent were equally innocent. The facts of the case showed that the appellants had acted fraudulently, The cases of *Scott* v. *Surman*, (*Willes' Rep.* 400.) and of *Taylor* v. *Plumer*, (3 *Maule & Selw.* 562.) show how far Courts will go in order to recover back notes passed away by a factor or trustee. Bills or notes in the hands of a banker or factor, who becomes bankrupt, do not pass to his assignees, but belong to his principal. (9 *East*, 12. 3 *Camp. N. P. Rep.* 301. 5 *Vesey*, 169. 12 *Vesey*, 119.) Is it true, that a person can pass negotiable paper, in all cases, and in all respects, as his own property? Must he not apply it to its proper office, by obtaining a credit on the note itself? This is what is meant by "the course of trade." There must be a new contract, or credit given, at the time, to the note. In the present case, the appellants made no engagement or contract on the faith of these notes; nor were the notes passed to them in payment of any debt then existing. All the numerous cases cited show the rule to be as we state it. (1 *Bos. & Pull.* 648. 1 *Moore's Rep.* 543. 2 *Dallas*, [illegible]96.) Will the appellants sustain any loss by returning to the respondent these notes? Their rights against *R. & S.* remain the same. They cannot be wronged by doing what is right towards the respondent. They ought not to pay their own debts with his property. The appellants received the notes after they knew that *R. & S.* were insolvent. A party who comes into possession of a forged note cannot recover the money on it. *Ex parte Bloxham* was a bankrupt case, and the assignees stand in the place of the bankrupt. In all the cases it will be found, that some new credit has been obtained on the notes which have been passed. In *Buller* v. *Harrison*, (*Cowp.* 565.) Lord *Mansfield* says, "Shall a man, though innocent, gain by a mistake, or be in a better situation than if the mistake had not happened? In this case there was no new credit, no acceptance of new bills, no fresh goods bought, or money advanced." "Is it conscientious, that the defendant should keep money which he has got by the misrepresentation of his principal, and should say, though there is no alteration in my account with my principal, this is a hit; I

have got the money, and I will keep it." The most injurious and pernicious consequences would flow from the doctrine contended for by the other side.

*T. A. Emmet*, in reply, said, that though the conduct of *R. & S.* may have been fraudulent, yet the appellants, *J. J. & J. C. C.* having acted honestly, may fairly retain the notes. The legal title is in them; they could support an action against the makers, at law. The question, who has the greatest equity, does not apply in this case. Who trusted most? The respondent might have limited the power of his agents, and have prevented their negotiating the notes. The appellants did not trust *R. & S.* when they took the notes, as payment or security. It is true, that this is a hard case on the respondent. There is hardship also in the case of the appellants; but the case must be decided by the general rules of law, not on considerations of any particular hardship. The great object and policy of the law is to make the circulation of negotiable paper as nearly as possible the same as money. It is not a question about goods, but money; and it is on the analogy to *cash*, that the principle as to negotiable paper stands. The true and only inquiry is, whether the holder came fairly and honestly by the paper. The principle is not to be limited and narrowed by the fact of his advancing money for the notes, or by his taking them in the course of trade, as it is called. These are *matters of evidence* to go to a jury, as to the *bona fides* of the transaction. The title of a *bona fide* holder is derived from the paper itself, not from the person from whom he receives it. The holder is not (as Lord *Mansfield* said) to be considered as an *assignee*. In the case of a bankrupt, his assignees stand in his place. So, executors and administrators stand in the place of the deceased. Whether the notes were received for a valuable consideration, or in the course of trade, would make two rules, instead of one; but neither of them is the rule. They only afford *evidence* in support of the true rule, the *bona fides* of the holder. It would be more correct to say, the note must be received in the course of business, or in honest dealing, &c. The question, to test the application of the principle,

IN ERROR. ALBANY, Nov. 1822. CODDINGTON v. BAY.

should always be, could the party, under the same circumstances, hold *money;* if he could, he may, for the same reason, hold negotiable paper. If this doctrine is well founded, it follows, that receiving the notes as an *indemnity* for responsibilities, is a good consideration, and sufficient to establish the *bona fides* of the transaction, on the part of the holder.

WOODWORTH, J. *Randolph & Savage* were the agents of the respondent, and, as such, held certain promissory notes belonging to him, which they, on the 12th of *June,* 1819, fraudulently, and without authority, passed to the appellants. It is stated, in the answer, that at the time the notes were received by the appellants, *Randolph & Savage were not, in a strict legal sense,* indebted to them in any amount whatever; but that the appellants were under engagements and responsibilities for them, having endorsed certain notes for *R. & S.*, and lent them their own notes to a large amount, none of which had then fallen due. That the appellants received the notes in question as a guaranty and indemnity against the responsibilities they were under, (all of which were then contingent,) and without notice of any interest, right, or title of the respondents.

The prayer of the bill is, that the notes so received be delivered to the respondent, or the amount paid to him.

This brief statement presents a case of hardship, let the loss fall as it may, inasmuch as no fraud is imputable to either of the parties concerned in this appeal. The question is one of strict law, in the decision of which, the community at large, and more especially the commercial part, have a deep interest. Any fluctuation in the law relating to bills of exchange, and promissory notes, would be a serious evil, and necessarily affect the circulation of this species of paper; distrust, and want of confidence, would embarrass mercantile operations, unless the rule to be applied be stable and uniform. With this view, I have carefully examined the cases cited on the argument. The general rule laid down seems to be this, that where negotiable paper is transferred for a valuable consideration, and without notice of any fraud, the right of the holder shall prevail against

IN ERROR.

ALBANY, Nov. 1822.

CODDINGTON v. BAY.

the true owner; all the cases substantially agree in this. In the application of the rule, this question arises, what is that *valuable consideration* intended, which shall protect the holder as against the drawer of the note? Is the rule satisfied, if enough is shown to make out a consideration, as between the holder and the agent, who assigned or transferred the paper? If nothing more is required, the appellants must prevail; for the notes were passed for the indemnity of the appellants, and, so far as *Randolph & Savage* are concerned, that formed a valid consideration. The right to hold against the owner, in any case, is an exception to the general rule of law; it is founded on principles of commercial policy. The reason of such a rule would seem to be, that the innocent holder, having incurred loss by giving credit to the paper, and having paid a fair equivalent, is entitled to protection. But what superior equity has the holder, who made no advances, nor incurred any responsibility on the credit of the paper he received, whose situation will be improved, if he is allowed to retain, but, if not, is in the condition he was before the paper was passed? To allow such a state of facts as sufficient to resist the title of the real owner, would be productive of manifest injustice, and is not required by any rule of policy; it is enough if the holder be secure when he advances his funds, or makes himself liable on the credit of the paper he receives. In coincidence with this principle, it appears to me, all the cases have been decided; for, although the rule is laid down generally, that the holder will be protected where the bill or note is taken in the usual course of trade, and for a fair and valuable consideration without notice, in every case I have met with, where the owner failed to recover, it appeared that the holder gave credit to the paper, received it in the way of business, and gave money or property in exchange. In *Miller* v. *Race*, (1 *Burr. Rep.* 452.) it is stated, that the mail was robbed, a bank note taken out, and afterwards passed to the plaintiff, an inn-keeper, who took it *bona fide, in his business, for a valuable consideration,* and without notice; it was held, that the plaintiff was entitled to the note. In *Grant* v. *Vaughan*, (3 *Burr. Rep.* 1526.) the plaintiff took a bill of exchange that had been lost, and paid the va-

IN ERROR.
ALBANY, Nov. 1822.
CODDINGTON v. BAY.

lue of it; it was held that he was entitled to the bill. Mr. Justice *Wilmot*, in that case, observes, "though both the claimants were innocent, yet, as *Grant* took the note in the course of trade, *bona fide*, and upon a valuable consideration, *Grant* has the better equity." Upon what is this better equity founded? Because *Grant* parted with his property *for the bill*, and was an innocent holder. In *Peacock* v. *Rhodes*, (*Doug. Rep.* 633.) it was held, that an innocent endorsee might recover on a bill of exchange with a blank endorsement, which had been stolen and negotiated; but it appeared, that the person who transferred the bill, bought cloth and other articles in the way of the plaintiff's trade, as a mercer, and received the value. Lord *Mansfield* says, "the jury have found that the bill was received in the course of trade, and, therefore, the case is clear, and within the principle of all the cases, from that of *Miller* v. *Race*, downwards." So, also, in the case of *Collins* v. *Martin*, (1 *Bos. & Pull.* 648.) it was held, that if *A.* deposit bills endorsed in blank with *B.*, his banker, to be received when due, and the latter raises money on them, by placing them with *C.*, and, afterwards, becomes bankrupt, *A.* cannot maintain trover against *C.* for the bills. In that case, as in all the preceding, the holder paid value for the bill; an advance was made in money; had that not been made out, it is evident to my mind that the holder would not have been protected. Chief Justice *Eyre*, in giving the opinion of the Court, observes, "if the holder gave no value for the bill, he would be affected by every thing which would affect the first holder." What is meant by giving value for the bill, must be collected from the whole case of which he is speaking. The holder, in that case, advanced his money on the credit of the bill. The language of the Court cannot be mistaken; something must have been paid in money or property, or some existing debt satisfied thereby, or some new responsibility incurred in consequence of the transfer; this would be paying value, and making out a good consideration within the reason and meaning of the rule. In such a case, the holder of a bill of exchange or promissory note, is not to be considered in the light of an assignee of the payee, and bound to take the thing assigned, subject to

all the equity to which the original party was subject; but he stands on the ground of an innocent purchaser of negotiable paper, who, having parted with his property, is entitled to the benefit resulting from his purchase, in opposition to the right owner. So, also, in *Lawson* v. *Weston*, (4 *Esp. N. P. Rep.* 56.) where a lost bill had been discounted, the plaintiff recovered. Lord *Kenyon* considered the point settled by the case of *Miller* v. *Race*, and observed, "if there was any fraud in the transaction, or if a *bona fide* consideration had not been paid for the bill by the plaintiffs, they could not recover." The general rule is to be understood as applicable to cases of this description; there does not seem to be any necessity to go farther. The credit of bills and notes cannot be impaired, or their circulation impeded, if the right of the holder is limited and restricted in this manner. He still retains all the rights that the law intended to confer on him, or that commercial policy can reasonably require. To deny the relief prayed for by the respondent, would introduce a new rule, not warranted by any of the adjudged cases.

Every man who takes negotiable paper, is supposed to know, that he does not acquire an indefeasible right. A note given for money won at play, or upon an usurious consideration, may be inquired into in the hands of an innocent endorsee. Does this obstruct the circulation of bills or notes? So, every holder knows, or is presumed to know, that the title of the right owner cannot be devested, unless value has been given, or liability incurred. The rule, then, as I conceive, is well established, and must govern the present case. The question is, whether the appellants are within its provisions? *Randolph & Savage* had stopped payment, and were insolvent, which was known to the appellants at the time they received the notes. They were not *then* indebted to the appellants; for none of the notes were due; the liability of the appellants was still contingent, although it is admitted there was good reason to believe it would soon become absolute. No responsibility was incurred in consequence of taking the notes; they were received as an indemnity; the situation of *Randolph & Savage* was desperate, and no doubt the appellants were anxious to get hold

of any thing that had the semblance of security. If the notes became effectual in their hands, then so much was gained; if not, they remained in *statu quo*. The mere probability that the notes would be valid in their hands, was inducement enough to seize on them with avidity; it might be the means of rescuing something from the shipwreck. Very different is the case of a holder for value paid; he makes the advance on the credit of the paper; if that fails, his loss is certain. But, it has been urged, that if the appellants had not reposed themselves on the rule now contended for, they might have obtained other security, and, consequently, they are prejudiced by the decree. This argument cannot be listened to; it only proves that the appellants may sustain an injury in consequence of mistake as to the rule of law. With this the Court has no concern. The true question is, have they paid value for the notes, or made any new engagements as the consideration of the transfer? This is not pretended. I am, therefore, of opinion, that the decree of his honour the Chancellor ought to be affirmed.

PLATT, J. concurred.

SPENCER, Ch. J. The facts in this case must be perfectly within the recollection of the Court. The respondent, being the owner of a schooner, employed *Randolph & Savage* to sell her. They made a sale, under an authorization from the respondent, and took negotiable notes, payable to themselves, from the purchasers, for 3,875 dollars, the consideration of the sale. Before the respondent could get possession of these notes, *Randolph & Savage* became entirely insolvent, and assigned to the appellants, without any request or solicitation on their part, the notes in question, with other debts, to secure the appellants for certain endorsements and responsibilities they were under for them; there being no other indebtedness on the part of *Randolph & Savage* to the appellants, nor had they then paid, or been called upon to discharge, any of their collateral liabilities. It stands conceded, that no new credit was given by the appellants to *Randolph & Savage*, in consequence of

the delivery to them of the notes in question; nor was there any other consideration paid or given for the notes, except the antecedent responsibilities which the appellants had entered into for them. The appellants allege, that when the notes were received and assigned, they did not know, nor had they any intimation, that the notes had been received by *Randolph & Savage*, in payment of the purchase money of the schooner, nor did they know any thing on that subject.

The question, then, between the parties, is brought to this single point: which of them has the best title to the notes; the respondent, on whose account and for whose benefit they were taken, in consequence of the sale of his property; or the appellants, who received them from the ostensible owners, as security for responsibilities, which had before been incurred, but who did not give any new consideration for them, nor part with any security, as an inducement to their being delivered?

The Chancellor has examined several of the cases, in which it has been decided, that bank notes, bills of exchange, and navy bills, having been passed, by a *mala fide* holder, or in a *mala fide* manner, might be held by the persons to whom they have been passed, when they were received in the regular course of trade, for a consideration advanced at the time, and were taken *bona fide*, and without any knowledge of the fraud, or want of title in the person passing them. All the cases cited by the Chancellor, and those cited by the appellants' counsel, have been decided on the ground, that the notes or bills were taken in the usual course of trade, and for a present consideration paid; not one of the cases is like the present, where notes or bills thus passed, were received in security of an antecedent debt.

We are, then, called upon to establish a new principle, or rather to ascertain a principle, from decisions in cases as nearly analogous as can be found. In the cases of *Miller* v. *Race*, (1 *Burr.* 452.) *Grant* v. *Vaughan*, (3 *Burr.* 1516. *and* 1 *Bl. R.* 485.) and *Peacock* v. *Rhodes*, (*Doug.* 633.) the Court lay stress on the fact, that the holder came by the notes for a full and valuable considera-

IN ERROR. ALBANY, Nov. 1822. CODDINGTON v. BAY.

tion, by giving money, or money and goods, for them, in the usual course of trade; and, I consider the real principle to be this, that the person passing the note, from the fact of his having possession, was the ostensible owner of it, and that the holder having, in the usual course of business, given credit to these appearances, which he was justified in doing, has been induced to part with his money or property *bona fide*; and that, as between him and the real owner, there must be a loss on one side or the other, the law will not devest him of fruits he has honestly acquired, without the possibility of remuneration. In other words, the equities of the parties being equal, the law leaves him in possession who already has it. But, how are the equities here? The respondent was clearly and justly entitled to the proceeds of the sale of the vessel, the notes in question; his agents and trustees were guilty of a grossly fraudulent abuse of their trust, in attempting to deprive him of those notes. Admit that the appellants came to the possession of them without any knowledge of the fraud on the part of *Randolph & Savage*, in passing the notes, how is their situation altered, or what equities have they as against the respondent? If they have to account to the respondent for these notes, their situation is exactly as it would have been had the notes not been transferred to them; merely having had the good fortune to get the notes, without any new consideration, or renouncing any lien, their equity to hold the notes, bears no comparison with that of the respondent to demand them. It was suggested, that they might have lost the benefit of some other security, had they not taken these notes; but of this, there is no proof or probability. It is not shown, or pretended, that *Randolph & Savage* had any other security to give; and it cannot be presumed, that they would have committed such a flagrant breach of faith, if they had any other available funds in their hands.

The appellants' counsel complained, that the Chancellor had laid too much stress upon these notes not having been received in the usual course of trade. This is one of the tests which we find the Judges applying, in order to determine the right of the holder to retain bills which have been passed by persons who have acquired possession, by robbery,

finding, or fraud. Now, I understand, by the usual course of trade, not that the holder shall receive the bills or notes thus obtained, as securities for antecedent debts, but that he shall take them in his business, and as payment for a debt contracted at the time.

It has been strenuously urged, that these notes are to be likened to cash, and that had *Randolph & Savage* become possessed of the respondents' cash fraudulently, and paid it to the appellants, that then, clearly, there could be no remedy. There is a material distinction between cash and notes, in this, that money is not generally capable of identification. But suppose *Randolph & Savage* had robbed the respondent of a bag of gold, (and their conduct, on this occasion, in a moral view, is nearly as bad,) and paid it to the appellants as an indemnity upon antecedent responsibilities, would they have a right to hold it, if the identity could be traced? I maintain they could not. Suppose, that *Randolph & Savage* had been bailees of the respondent's goods, and had delivered them as security to the appellants, can there be a doubt that the respondent could have brought trover for the goods? What is the difference, in principle, between the case last put, and the present? I know it has been decided very often, and correctly, that the analogy does not hold between bills and goods, for that the possession of goods does not vest the property, and the transferree's title cannot be better than the transferrer's, but that, with respect to bills, or notes, the whole property passes by endorsement. This is true only *sub modo;* there is a *prima facie* ownership; but the holder may be a mere servant sent to receive the amount of the bill, or he may be a bailee or a trustee, as *Randolph & Savage* were in the present case, and, therefore, it is, because he is the apparent owner, and has power to receive the money as holder of the bill, that, if he passes it to a *bona fide* purchaser, upon a consideration paid at the time, his title shall prevail. This is not only right in itself, but the contrary doctrine would destroy the circulation of notes, and would justly alarm the mercantile world. But where the holder is not himself imposed upon by giving a new consideration for the bill; where, in other words, he has not

been cheated, whether he retains the bill or not, he cannot have a property in the bill against the true owner.

To test the principle still further; suppose the appellants had been under no responsibilities for *Randolph & Savage*, and the latter had freely given them these notes, could they then insist on retaining them? This, I believe, will not be asserted; and yet, if the notes were the property of *Randolph & Savage*, because they were payable to them, and if a Court could not look beyond the notes, their gift of them would change the property.

I understand Chief Justice *Eyre*, in *Collins* v. *Martin*, (1 *Bos. & Pull.* 651.) as meaning to say, that there must be a consideration paid when the bill is received. He says, "if it can be proved that the holder *gave no value for the bill*, then, indeed, he is in privity with the first holder, and will be affected by every thing which would affect the first holder." And in the case of *Joy* v. *Campbell*, (1 *Sch. & Lefroy*, 346.) Lord *Redesdale*, referring to Lord *Bolingbroke's* case, in the discussion of which a case was cited, which he mentions with approbation, where an executor transferred part of the assets, for the avowed purpose of paying his own debt, in which case, the person receiving the assets was held liable, for, by this sort of dealing, the person concurs in a *devastavit*, as the value he gives for the assets is of a nature which it is impossible should be applied to the purposes of the administration. The administrator had the legal ownership; he had a right to sell the goods; but as the purchaser paid him nothing, but took the goods on account of his debt against the administrator, equity would not allow him to retain them. The case, in principle, is very analogous to the present.

I have not been able to bring my mind to doubt the correctness of the Chancellor's decree, and I think it ought to be affirmed.

HOPKINS, Senator, concurred.

BOWNE, DUDLEY, HUNTINGTON, LIVINGSTON, MILLER, MOERS, and MORE, Senators, were of opinion that the decree of the Court of Chancery ought to be reversed.

VIELIE, Senator. The respondent, residing in *Hudson*, and being the owner of the schooner *Express*, employed *Randolph & Savage*, merchants and copartners in *New-York*, defendants in the Court below, as his agents or factors, to negotiate a sale of the schooner on credit, with instructions to take unexceptionable paper, and send the notes received, by some safe conveyance, or by mail, to the respondent. Under these instructions, *R. & S.* effected a sale, at the price of 3,875 dollars; and, on the third of *June*, 1819, received negotiable promissory notes for the amount, and for which an account is sought, by the bill filed in this cause. The notes thus received, notwithstanding the repeated applications of the respondent, were not transmitted to him, under the imposing pretence of retaining them until they should be counter secured for a guaranty, which they had voluntarily assumed, upon the sale of the vessel. On the 11th of *June*, and eight days after the receipt of the notes referred to, *R. & S.* stopped payment, and on the same day executed an assignment of all their effects and credits in *Connecticut* and *Massachusetts*, to *Jesse Savage*, for the benefit of the assignee, and of *Josiah Savage*, senior, and to secure the appellants for responsibilities. The next day, being the 12th of *June*, *R. & S.* transferred the notes in question, with others, to the appellants, without receiving any kind of payment or consideration for them, but merely as indemnity against responsibilities; and, on the 14th of *June*, *R. & S.* executed an assignment of sundry other effects and credits, to the appellants, and *Thomas H. Smith*, for the benefit of *Smith*, and to secure the appellants against responsibilities. Shortly after, and before the 17th of *June*, the respondent offering the required guaranty and payment of legal charges, called on *R. & S.* for his notes, but did not obtain them, nor any satisfactory account of them, as it would appear from the case, nor even an intimation of the disposition that had been made of them.

The appellants, in their answer, deny any knowledge that these notes were the property of the respondent, or had been received by *R. & S.* on his account.

IN ERROR.
.......
ALBANY, Nov. 1822.

CODDINGTON v. BAY.

Upon these facts, his honour the Chancellor, has decreed an account against all the defendants, and against *R. & S.* for costs.

As against *R. & S.* there can be no doubt of the propriety and correctness of this decree. They being the agents of the respondent, it is a case of ordinary equity jurisdiction, and their conduct in the transaction is marked with a character of deliberate fraud.

The appellants, however, claim to stand on different ground, and to be invested with other rights, and greater privileges. Whatever might have been the difference between them, in a moral point of view, if a knowledge of the circumstances, under which these notes were held by *R. & S.* had been brought home to the appellants at the time of the *transfer*, there can be little doubt, but that in contemplation of law, and in the view of a Court of equity, they would then, as assignees of *R. & S.*, have been in the same situation, and equally exposed to the respondent's claim.

But having, by their answers, denied notice of the trust, and any knowledge of the relation in which *R. & S.* stood, as factors to the respondent, it must be conceded that the appellants stand altogether in a different light, and that the question of their liability to account must be decided on different principles.

It was accordingly contended, on the argument, that the appellants having received the notes in controversy without notice of the trust, and upon a consideration not fraudulent in itself, that of indemnity for responsibilities before incurred, were entitled to hold them, even against the true owner.

The rule by which this proposition is to be supported, had its origin in the commercial policy of that country from whence our system of jurisprudence is derived, and where every facility was rendered to the negotiation of commercial paper, and protection afforded to the *bona fide* holder, in all cases where the interests of trade were supposed to be promoted.

By a recurrence, however, to the numerous cases upon this subject, from which the rule is to be extracted, and its

true extent ascertained, it will be found, that in no case has the title of the holder of negotiable paper been sustained against the true owner, except where value has been paid, or a new credit given in consideration of the transfer itself. And though indemnity for responsibilities is undoubtedly a good consideration for the sale or transfer of goods, or negotiable paper, as against the party making it, or his representatives, yet, in none of the cases cited on the argument, and in no one that I have been able to find, has it ever been held to be sufficient to bar the true owner, upon a fraudulent transfer.

A factor, though authorized to sell, cannot pledge the goods of his principal, because, he has not the property in them. And the only reason why a different rule has been applied to negotiable paper, the avails, perhaps, of those very goods, and in the hands of the same agent, is, because the interests of trade have been supposed to require, that every facility should be afforded to its negotiation, that thereby commercial credit might be extended, and when extended in good faith upon the paper itself, it should be sustained. It has, accordingly, been held, that where a note or bill has been lost or stolen, and subsequently disposed of to an innocent dealer, who gives credit to the paper itself, at the time he receives it, he may hold it even against the legal owner. (*Grant* v. *Vaughan*, 3 *Burr. Rep.* 1516. *Miller* v. *Race*, 1 *Burr. Rep.* 452., and the cases there cited.)

The latter being a rule of commercial policy, it can be applied only where the reason of the rule applies, and that is, where the transfer itself obtains a new credit, or, as was said on the argument, where it *does the office of negotiability*; as where money or goods are obtained upon the credit of the paper itself, and not where the transfer is founded upon a previous credit; because, in the latter case, the general interests of trade are in no way promoted, the only operation being, to effect a satisfaction of one person's claim, by an equal injury to another, thus leaving the benefit and disadvantage, so far as general interest is concerned, precisely balanced.

IN ERROR.
ALBANY, Nov. 1822.
CODDINGTON v. BAY.

Why should a rule, founded upon commercial policy, be extended farther than that policy requires? That policy does not extend to a negotiation in consideration of previous credit, and, therefore, the rule itself ought not. It can hardly be deemed good policy in this country, whose interests are not so exclusively commercial as that from which we derive our notions of commercial law, to extend this, or any other rule, having for its object the favour of trade, any farther than it has been carried there. And I venture the remark, that no case can be found, where a fraudulent transfer of negotiable paper was held to devest the true owner of his title, except where the receiver himself was not only innocent, but directly prejudiced by the credit given to the paper itself. In *Solomon* v. *Bank of England*, (13 *East's Rep*. 135. in note,) in trover for a note detained by the officer of the bank, on its presentment for payment, though the plaintiff had received the note *bona fide* from his correspondents, in reduction of the balance due him, from them whose banker he was, yet, because there were circumstances of suspicion against his correspondents, (the note having been fraudulently obtained by some person,) and because the plaintiff had not paid a valuable consideration for the note before notice, he was nonsuited, and the Court refused to set it aside.

It is not, therefore, the mere *transfer* of the bill or note to an innocent person, ignorant of the fraud, that will devest the title of the owner, but it must be transferred upon a *sufficient consideration*. (*Chitty on Bills*, 190.)

What is to be deemed a sufficient consideration, is the true question. And though, as I have before remarked, an indemnity for prior responsibilities may be a sufficient consideration for some purposes, and between parties and their representatives; yet, in the absence of authority to support it, I think it has been shown, that tested by the reason of the rule which has obtained in the Courts upon that subject, it cannot be taken as sufficient in principle to bar the owner of his title, by a fraudulent transfer. It would be inequitable, unreasonable, and unjust, that the benefit derived by the party claiming to hold, without correspondent injury if

he could not hold, should be sufficient not only to countervail, but prevail over, the unmerited injury which the owner is to sustain by his consequent loss. The true test, I take to be, that when the holder is left in as good a condition, after a retransfer, as he would have been had no transfer taken place, there the title of the owner shall prevail. This allows the rule, so far as it is dictated by commercial policy, to have its full effect, while it protects the owner of negotiable paper, necessarily intrusted, in the course of business, to the care of agents, from an injury revolting to every principle of moral equity.

If this be a correct guide to a decision upon this subject, there can be little doubt, that the respondent's claim to the notes in controversy ought to prevail.

The appellants cannot, with any propriety, complain, that the respondent enabled *Randolph & Savage* to impose a false credit upon them; on the contrary, there is good reason to suppose, that the conduct of the appellants, in sustaining the pecuniary credit of *R. & S.*, to an extent apparently indiscreet, if not unusual, may have had a tendency to mislead the respondent. The respondent, however, never trusted to the pecuniary responsibility of *R. & S.*, as did the appellants, but merely relied upon their integrity to effect the sale, and transmit the notes that might be received by them. Nor is there any good ground of complaint to the appellants, that they have been prejudiced by trusting to these notes, to the neglect of other security. They were favoured creditors of *R. & S.* The facts that the first assignment was made for their indemnity, without their knowledge, and that these notes were delivered to them, in violation of every legal, and every moral obligation towards the respondent, show that they were highly favoured by *R. & S.*, and yet, notwithstanding the subsequent assignment that was made for their benefit, in preference, and to the exclusion of the respondent's claim, they are losers, admitting the amount of the notes to be applied to the extinguishment of the debt arising from the endorsements for which they have since become liable. This is their own account of the matter in their answer, and it is not pretend-

IN ERROR. ALBANY, Nov. 1822. CODDINGTON v. BAY.

ed that they were induced to become endorsers by any credit derived from the property or notes of the respondent.

These facts show, that the want of sufficient indemnity must have arisen from a want of means, and not from a want of disposition in *R. & S.* to place, and in the appellants to take, every thing tangible into their hands.

In the view I have taken of the subject, the appellants obtained no legal title to the notes, as against the respondent, and the latter having the stronger equity, is entitled to an account. In my opinion, therefore, the decree appealed from ought to be affirmed.

The rest of the Senators were, also, of opinion, that the decree of the Chancellor ought to be affirmed. This being the opinion of a majority of the Court,* the following decree was entered: "Counsel having been heard in this cause, and due deliberation being thereupon had, it is ORDERED, ADJUDGED, and DECREED, that the decree of the Court of Chancery, in this cause, be affirmed, and that the appeal be dismissed; and that the appellants pay to the respondent his costs in defending this appeal, to be taxed; and that the record be remitted," &c.

* *Nov.* 13*th. For affirming* 22. *For Reversing* 7.

Decree of affirmance.