FAIR LOANS, INC. *v.* WILKINSON ET AL., TRADING AS
CHECK GUARANTY FUND

[No. 23, October Term, 1956.]

218

*Decided November 12, 1956.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON and HAMMOND, JJ., and HENDERSON, J., Chief Judge of the Fourth Judicial Circuit, specially assigned.

*John R. Reeves,* with whom was *Joseph Luria* on the brief, for the appellant.

*Stedman Prescott, Jr.,* with whom were *A. Freeborn Brown* and *T. Carroll Brown* on the brief, for the appellees.

HAMMOND, J., delivered the opinion of the Court.

John N. Wilkinson, Jr., and Paige K. Richardson, trading as Check Guaranty Fund, sued Fair Loans, Inc., to collect the amount of a check signed by the latter and endorsed to Check Guaranty Fund by the payee, on which payment had been stopped. Trial was before a jury in the Circuit Court for Montgomery County. At the conclusion of the case, the court directed a verdict for the defendant. Later, the court granted a motion for judgment *non obstante veredicto* and entered a judgment for the plaintiffs for the amount of the check and interest, and the appeal is from that judgment.

Paige K. Richardson was the sole owner and operator of Bel Air Auto Auction. An automobile auction business cannot be successful without responsible guarantees that the checks given by buyers are good. To meet this need, Richardson and John N. Wilkinson, Jr., formed a partnership in 1953, called Check Guaranty Fund, and began the business of guaranteeing checks given by buyers of automobiles to the sellers. A dealer desiring to sell an automobile paid a fee of $8.00, of which $5.00 went to the auction as a fee for selling the car and $3.00 went to Check Guaranty Fund as its fee for the guarantee of the purchase price.

On May 21, 1953, H. H. Vicks, an automobile dealer from College Park, who traded as Vicks Motor Sales, came into the office of Check Guaranty Fund, which was in the building where the auctions were conducted, made an application, was approved, and began to make purchases at the auto auctions. Check Guaranty Fund guaranteed checks given by Vicks to sellers on May 21, May 28, and June 4, 1953. Two checks given by him on May 28 totalling $3,240.00 and two checks given on June 4 totalling $4,320.00, were not paid when presented for payment by the sellers. Holders of all four of the checks, upon receiving notice of their dishonor, immediately made demand on Check Guaranty Fund to make them good. The backs of three of these checks bore a stamped legend that they had been guaranteed by Bel Air Auto Auction. Wilkinson's testimony was explicit as to the fact that Check Guaranty Fund had been paid to guarantee and had guaranteed all four of the checks, including the three guaranteed by

Bel Air Auto Auction. Check Guaranty Fund made good the checks, paying one of the May 28th checks on June 11, and the other on June 12. Also, on June 12, it paid a $3,250.00 check given by Vicks on June 4; the other June 4th check of $1,070.00 was paid by it on June 15. Check Guaranty Fund was notified by the sellers holding the checks that they were bad some days before they were redeemed. Wilkinson called Vicks and asked him to pay Check Guaranty Fund the amount of the checks. Vicks acknowledged his obligation and promised to come up and make good the amount of the checks. On June 12, after Check Guaranty Fund had paid $6,490.00, Vicks paid it $2,200.00 in cash and delivered to it a check endorsed to its order by the payee, Vicks Motor Sales, and drawn by Fair Loans, Inc., on the Suburban Trust Company of Silver Spring in the amount of $2,100.00. The $2,100.00 check was deposited in the bank account of Check Guaranty Fund but was returned by the bank on June 24 marked "payment stopped". Fair Loans, Inc., refused to make good the check and suit followed a year later.

The testimony produced on behalf of Fair Loans, Inc., did not controvert the testimony for Check Guaranty Fund but showed the circumstances of the issuance of the check by Fair Loans, Inc., and attempted to show circumstances it claimed brought about an estoppel against Check Guaranty Fund. Vicks sold to Fair Loans, Inc., a conditional sales contract for the purchase of an automobile by an individual and received in payment the $2,100.00 check. Fair Loans, Inc., learning that the individual had not taken the car and that the deal was off, stopped payment on the check. There was further testimony that a few days after payment had been stopped, a man stating that he was the lawyer for Bel Air Auto Auction, called Fair Loans, Inc., asking the reason for stopping the payment. Upon being told, he is said to have replied that instead of bringing criminal charges against Vicks for $5,000.00, they would bring a charge for $7,000.00, and said that he would not return the check as it was needed in connection with the charges intended to be presented against Vicks. Fair Loans, Inc., also showed that Check Guaranty Fund was an entity entirely separate and distinct from Bel

Air Auto Auction and that Check Guaranty Fund would not be liable for a debt of Bel Air Auto Auction.

Fair Loans, Inc., the appellant, contends that Check Guaranty Fund was not a holder in due course of the $2,100.00 check issued by it and on which suit was brought. Pertinent are several provisions of Code, 1951, Art. 13. Sec. 72 provides:

> "A holder in due course is a holder who has taken the instrument under the following conditions:
> 1. That it is complete and regular on its face.
> 2. That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact.
> 3. That he took it in good faith and for value.
> 4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Sec. 45 reads as follows:

> "Value is any consideration sufficient to support a simple contract. An antecedent or pre-existing debt constitutes value; and it is deemed such whether the instrument is payable on demand or at a future time."

There is no real contention that the check was not complete and regular on its face, or that it was taken after it was overdue or that it had been previously dishonored. Appellant's real contention is that Check Guaranty Fund was not a holder in due course because first, it did not take the check for value and second, it did not take it in good faith in that it had reason to suspect the defect in Vicks' title arising from the fraudulent circumstances under which the check was obtained.

In support of the first contention appellant argues that even though the Code gives an antecedent or pre-existing debt standing as value, Check Guaranty Fund is not a holder in due course because (a), there was no debt due by Vicks to it at the time it received the check from Vicks and (b), even if there was a debt from Vicks to Check Guaranty Fund,

its mere existence, in and of itself alone, did not constitute value because Check Guaranty Fund parted with nothing in accepting the check of Fair Loans, Inc., and did not alter its position or prejudice itself in any way; that is to say that it did not cancel any part of the debt or extend the time for payment, or otherwise forbear.

It is urged that there was no debt due Check Guaranty Fund by Vicks at the time Vicks delivered the Fair Loans check, because the checks given by Vicks to the sellers were endorsed by Bel Air Auto Auction and not by Check Guaranty Fund. Next it is said that because there was no evidence the sellers had assigned their respective claims against Vicks to Check Guaranty Fund, Check Guaranty Fund had no obligation to pay Vicks' debts and in doing so was a mere volunteer. The decisive point is not whether Bel Air Auto Auction was liable as guarantor of Vicks' checks but whether the evidence established that Check Guaranty Fund was liable. We find that the testimony of Wilkinson—and the appellant produced no material controversion—shows that Check Guaranty Fund for a fee paid beforehand guaranteed every check given by a buyer to a seller. He was asked whether Check Guaranty Fund had had occasion to guarantee any of Vicks' checks. His answer was: "I did, sir" and said that it was "On May 21, May 28 and June 4, 1953." Wilkinson summarized the two bad checks given by Vicks on May 28 and the two bad checks given by him on June 4. He was then asked: "Now did the Check Guaranty Fund endorse and guarantee all four of those checks?" and he answered: "Yes, sir." In answer to the question: "And did the Check Guaranty Fund have to make those checks good when they were not honored?", he said: "Yes, sir." He was asked: "Now, how much money did Mr. H. H. Vicks owe the Check Guaranty Fund on June 12th, 1953?" and his answer was: "The sum of these four checks, plus protest fees, which amounted to in excess of $7,500.00." There was testimony that Vicks acknowledged this indebtedness, totalling some $7,500.00, to Check Guaranty Fund in his conversations with Wilkinson, and testimony that $6,490.00 and protest fees had been paid by Check Guaranty Fund to the sellers before Vicks repaid $4,300.00. We

find that Check Guaranty Fund was a creditor of Vicks when it took the check in suit.

We turn to the argument that Check Guaranty Fund could not be a holder in due course because it did not take the check in absolute satisfaction of $2,100.00 of the debt—that is, did not release Vicks from his liability for so much of his debt, except as, if and when the check were paid, and did not extend the time of payment. When a debt is due and the check of the debtor is passed in full or partial payment, or the check of another, endorsed by the debtor, is delivered in full or partial payment, there is no presumption that the check is received in absolute satisfaction of the debt. Rather, the presumption is that it is a conditional satisfaction. 6 *Williston on Contracts,* Rev. Ed., Sec. 1875F; *Matthews v. Dare,* 20 Md. 248; *Sebastian May Co. v. Codd,* 77 Md. 293, 305, *et seq.*

Not only is appellant's criticism of appellees' normal business practice of accepting the check in conditional satisfaction without weight or significance but, more fundamentally, the legal consequences are not as appellant claims them to be. The overwhelming weight of authority makes it plain that a pre-existing debt is a sufficient consideration to make a holder for value one who receives a note as collateral security or a check in conditional satisfaction, without discharge of the debt in whole or in part, or extension or forbearance on account of the claim. Appellant relies on the case of *Harris v. Fowler,* 110 N. Y. S. 987, in which there was a suit on a check signed by an accommodation drawer which had been fraudulently diverted. The Court found that the holder of the check could not prevail as a holder for value against the accommodation drawer. The Court agreed that a pre-existing debt constituted value but held that the antecedent debt must have been cancelled and discharged on the acceptance of the check, or the time of the payment extended if the holder were to be one for value. When the decision was handed down in 1908, *Coddington v. Bay,* 20 Johns. 637, decided in 1822, controlled the New York law, although the great weight of authority elsewhere was to the contrary. The negotiable instruments law had been enacted in New York in 1897 but her Courts apparently could not bring themselves to believe, much less to

hold, that the statutes had abrogated the rule in *Coddington v. Bay,* wherein it was held that in order to constitute one a holder for value as indorsee of negotiable paper, it was necessary that he should part with some consideration. The law of New York is no longer to that effect. See *Broderick & Bascom Rope Co. v. McGrath* (1913), 142 N. Y. S. 497, 498. There the Court said that the later cases have held "that the Negotiable Instruments Law has changed the rule in this state, and brought our law in harmony with that of other jurisdictions, and a pre-existing debt, without extension or forbearance, is a sufficient consideration to constitute a holder for value." In *Kelso & Co. v. Ellis,* 121 N. E. 364, decided ten years after *Harris v. Fowler,* the Court of Appeals of New York pointed out that the inertia of the Courts had carried the rule of *Coddington v. Bay* along for some distance before the external force of the Negotiable Instruments Law acted upon it, and then went on to say: "But it is perfectly clear that for the sake of uniformity New York has abrogated the rule which had been in force since the year 1822." In *Elband & Reinstein Co., Inc. v. Schiff,* 8 N. Y. S. 2d 838, it was held, *per curiam,* as follows: "The taking of the $500 check without notice of any infirmity as a conditional payment for an antecedent indebtedness was for value. *Kelso & Co. v. Ellis,* 224 N. Y. 528, 121 N. E. 364."

The law elsewhere in the country is almost uniformly that of the later New York cases. In *Ahern v. Towle* (Mass.), 39 N. E. 2d 561, 565, the Court, referring to the language of the statutes that an antecedent or pre-existing debt constitutes value, said: "This language is of broad scope and import. It is settled that one who receives a check in satisfaction of or as security for an antecedent or pre-existing debt is a holder for value. * * * (citing cases). We are of opinion that the provisions of the statute are not limited to cases where the instrument is received on the unusual terms of absolute satisfaction, and that, though received on the usual implied terms of conditional satisfaction of an antecedent debt, the transfer is also made for value." A number of cases and texts are cited in support of this holding. In *Citrin v. Tansey,* 153 A. 523, where it was contended that plaintiffs were not holders for

value, because of their statements that they took the note for collection and "* * * if it was not paid they would charge it back", the Court of Errors and Appeals of New Jersey held that if the testimony be accepted as true, "* * * it is manifest that the plaintiffs had held these notes at least as security for the payment of the debt due to them from the payee of the notes. Naturally if the notes were not paid, the debt * * * would be unsatisfied and the notes would be charged back. It is, however, settled law that a party taking a negotiable instrument in payment of, or as security for, a precedent debt, is a bona fide holder for valuable consideration and entitled to protection as such." In *Merced Security Sav. Bank v. Bent Bros., Inc.,* 279 P. 765, the Supreme Court of California decided in an action on a check on which payment had been stopped, that the check had been taken by the endorsee bank in a clearing house settlement of business between it and the payee bank in good faith without notice of any inequities and that, therefore, the payee bank was a holder for value. See also *People's Finance & Thrift Co. of Pomona Valley v. Matthews Fruit Co.* (Dist. Ct. App.—Cal.), 286 P. 710; and *Sasner v. Ornsten* (Dist. Ct. App.—Cal.), 209 P. 2d 44.

The Maryland law is in accord with the general rule. In *Maitland v. Citizens' Nat. Bank,* 40 Md. 540, 562, 567, Judge Alvey, for the Court, pointed out that although the principle that one who receives negotiable papers simply as collateral security for precedent debt is entitled to protection as a holder for value, has been contraverted in some quarters (and he was referring, as he makes clear later, to the Courts of New York and of some other States which were following the decision of *Coddington v. Bay, supra*) and the cases repudiating the rule have been pressed upon the Court, "* * * the reasoning of those cases does not convince us of the correctness of the conclusions maintained by them." The Court decided that the transfer of a note either as collateral security for a preexisting debt or to secure future advances, or both, would be based on a valuable consideration "* * * in the sense of the rule which protects the holder of negotiable paper, and the plaintiff be entitled to the full benefit of the security, unless *mala fides,* or notice of such facts as will impeach its title to

the note be shown." See also *Blacher v. National Bank of Baltimore,* 151 Md. 514; *Buchanan v. Savings Institution,* 84 Md. 430; *Cecil Bank v. Heald,* 25 Md. 562.

Consideration of appellant's contention that the check was not taken in good faith, because Check Guaranty Fund did not investigate the circumstances and the validity of Vicks' title to it, must be approached in the light of Code, 1951, Art. 13, Sec. 76, which provides that:

> "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

Wilkinson testified that he took the check as part payment of an indebtedness, that he had no knowledge of any defect in it at the time he took it, that he took it in good faith. When he was cross-examined as to whether he was not put on guard by the notation on the check "deal of Simoneau", he said he could make out and had read the words "deal of", and that he had made inquiry of Vicks and was told that he had a deal for the car and had sold it (the car being a Cadillac he had bought with one of the bad checks). There was evidence that other dealers had been in the same predicament as Vicks and had made good and there was the encouraging fact that Vicks was able to produce $2,200.00 in cash at the time he passed over the check. We find in the testimony no evidence whatever of actual knowledge of any infirmity or defect and no indication of knowledge of any facts which could amount to bad faith under the tests of the statute and the cases. See *Weant v. Southern Trust Co.,* 112 Md. 463, 471; *Dean v. Eastern Shore Trust Co.,* 159 Md. 213, 220. We think that appellant's contention on this point is without substance.

Appellant's final contention is that Check Guaranty Fund is estopped from claiming to be a holder in due course because of the call from the attorney, representing himself as counsel for Bel Air Auto Auction. It is urged that the statement of the lawyer that the check would be retained for use as

evidence in contemplated criminal proceedings, lulled Fair Loans, Inc., into believing that no civil claim could be made against it. An officer of Fair Loans, Inc., testified that because of the statements of the lawyer, no effort was made to trace the automobile or the title, and that other steps it might have taken for its protection were not taken.

It is undisputed that the conversation between the lawyer for Bel Air Auto Auction and the official of Fair Loans, Inc., took place on June 18, 1953. However, Check Guaranty Fund took the check on June 12, 1953. Code, 1951, Art. 13, Sec. 72, which has been quoted above, provides in paragraph 4 that one is a holder for value provided that at the time the instrument was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it. Check Guaranty Fund became a holder in due course on June 12. We see nothing in the record to show that it did or failed to do anything after that date that altered the respective rights and obligations between it and Fair Loans, Inc. Certainly, one in the business of lending money cannot claim persuasively that the mere statement to it that criminal prosecutions are to be brought against a wrongdoer would prevent or abate a cause of action by a holder in due course of one of its checks. No more plausible is the argument that its assumption that it would not be called upon to pay the check—an assumption not warranted under the law and naive in fact—caused it to forego search of the automobile and the title and the taking of other unspecified steps to protect its rights. Check Guaranty Fund was not estopped from collecting the check.

*Judgment affirmed, with costs.*