WRIGHT *vs.* DELAFIELD and CURTIS, trustees, &c., BERRIEN and others.

Where a deed fails to convey a fee, for want of words of inheritance, a court of equity will reform it in that respect. And the parties may do the same thing, in effect, by their own voluntary act.

On the 28th of November, 1835, several proprietors of land, in pursuance of an agreement previously entered into, and for the purpose of vesting the whole title to the lands in trustees, so that the latter could sell, and give a good title to purchasers, without the intervention of the proprietors, by deed referring to the agreement, conveyed the land to three trustees and their successors, to hold to the use and benefit of the proprietors, but no words of inheritance, and no express words showing the duration of the trust or of the estate granted, were used. On the 28th of November, 1838, a majority of the proprietors, pursuant to a clause in the original articles of agreement, signed an agreement modifying those articles and appointing C. & G. trustees in place of the three original trustees, and·directing the latter to convey to C. & G. *the legal estate* in the lands. Accordingly, on the 29th of November, 1838, the original trustees conveyed the land to C. & G. with *words of inheritance.* On the 27th of November, 1843, D. & C. were appointed trustees, the former in the place of G., and the proprietors directed G. to convey the *legal estate* to D. & C. as trustees, and G. accordingly conveyed to D. & C. with words of inheritance. In 1844 and 1848 the proprietors expressly declared that D. & C. were thereby " *continued* in office as trustees."

*Held* that this was a recognition of D. & C. as lawfully existing trustees, with such estate as was granted to them, and a reappointment of them with the like estate. That it was a confirmation of the conveyance to the new trustees, and bound the proprietors; especially as it was in conformity with the actual

Wright *v.* Delafield.

intention of the original articles. And that D. & C. as such trustees, could give a legal and equitable title to a purchaser, unless it was affirmatively shown that there was some defect in the original title of the proprietors, or that the land was incumbered, or the trust deed was void.

*Held also*, that the original trust deed of November 28th, 1835, was valid as a power in trust, under the revised statutes; and that the present trustees could give a good title, by virtue of the power in trust granted to them.

*Held, further*, that where a party purchased a portion of the trust property of the trustess, in 1841, he at that time being also an owner of 11 out of 2400 shares of which the whole property consisted; and had remained in possession, under the trustees, and received the rents, and paid three installments upon his purchase, not showing any other proprietor, under whom he held, he could not refuse to pay the consideration agreed on for his purchase, without offering to rescind the contract and deliver up the property.

*Also held*, that the purchaser could not keep the land and refuse to pay for it; whether the title was good or bad. That if it was bad, he must elect to take it as it was, or as the proprietors could make it, and pay for it; or else to give it up and account for the rents and profits. And that, as he did not elect to do the last, he must pay for the land.

In the absence of proof to the contrary, it is to be presumed that the laws of another state are the same as ours, in respect to contracts relating to personal estate, and as *to commercial matters particularly; and that when the common law is known to prevail, it is construed there as it is with us*, whether relating to lands or personal property.

But no such presumption can be entertained in respect to the statute law of this state.

Under a power given to the directors of an association " to appoint a secretary and such surveyors and other assistants as may be necessary," they can appoint an agent, who may sign contracts, on such terms as shall be previously authorized by them.

Generally, the question whether a good title can be made is to be passed upon before a referee, and so also is an account to be taken before him. But the parties may, if they choose, and the court consent, have those matters inquired into by the court.

Where a purchaser seeks a specific performance, he is bound to pay notes given by him for the purchase money, and interest, together with the costs of suits brought against him upon those notes, and the costs of the suit for a specific performance, before he will be entitled to a deed.

A PPEAL by the plaintiff, from a judgment entered at a special term. In the year 1835, the executors, &c., of Robert Mitchell, deceased, the trustees of creditors of the firm of Carnochan & Mitchell, and six other persons in their own right, being the proprietors in various proportions of a tract of land,

in Florida, between the St. Mark's and Apalachicola rivers, containing about one million two hundred thousand acres of land, known as the Forbes' Purchase, entered into an agreement dated on the 25th of November of that year, reciting that, to enable the proprietors *to give clear and unimpeachable titles to purchasers without delay*, it was proposed to vest the whole title in three trustees, so that they might *immediately* make legal title to all purchasers, and divide the proceeds among the parties. The agreement also provided, that such tract should constitute a common fund, for the use of the parties thereto according to their interests, and that to render such fund available in the most expeditious manner, they associated themselves together thereby as a company, under the name of the Apalachicola Land Company ; that the land should be conveyed to Messrs. McLane, Davis and White as such trustees, in trust for the parties thereto in various proportions, and to convey the same as therein prescribed ; which trustees should divide the said land, so constituted a common stock, into 2400 shares of 5000 acres each, for which they should issue certificates to the proprietors according to their respective interests, transferable only on the books of such company. They were also to convey the lands to such persons as purchasers, as should be selected by six or such other number of persons as they should designate, to be chosen by the proprietors at such times as the trustees should appoint, to whom the names of directors was given ; the first trustees (being the six largest proprietors) to have the purchase money placed in their hands, to be distributed among the proprietors ; their *term of office* was to be for three years, at which time their trust was to close, unless renewed by a vote of such directors ; the agreement also provided that two-thirds in number of the certificate holders might arrest the proceedings of the directors, remove them, elect new ones, and make further regulations and restrictions for the sale of the lands, and the distribution of the proceeds ; and that two-thirds in interest of such certificate holders concurring after a period of three years, might alter or modify the provisions of that agreement in such manner as they might think most conducive to the interest of the concern.

Provision was also made in such agreement to pay off a mortgage upon the land conveyed, by a sale of some of the certificates of ownership, so to be issued, and to have the certificates belonging to the trustees of the creditors of Carnochan & Mitchell held by the trustees of the company, until a definite arrangement could be made with such creditors, or delivered to such creditors, and the remaining stock handed over to the trustees of such creditors. The proprietors of the land, on the same day the agreement was executed, by a cotemporaneous deed of bargain and sale, conveyed their interest and shares in such lands to Messrs. McLane, Davis and White, and their successors, without any words of perpetuity, to have and to hold the same to the use of the stockholders of the company, known as the Apalachicola Land Company, and for the trusts and purposes set out in such agreement, and no other. Between the years 1835 and 1838, William Wright, the father of the plaintiff, who, as survivor of a previous firm, was a creditor of the firm of Carnochan & Mitchell, made a compromise with their assignee, by means of an agent, and received twenty-four shares of the stock of such association, and subsequently gave the plaintiff, some time between the years 1840 and 1842, twelve shares of such stock; this stock was placed on the books of the association in the name of Wright & Co., which partnership consisted, in the years 1839, 1840 and 1841, of the plaintiff and the agent who made the compromise. In the fall of the year 1840 or the succeeding winter, the plaintiff entered into possession of part of the lands so conveyed to said trustees, consisting of a wharf lot and another in the neighborhood, in the city of Apalachicola, and built a wharf on the first, and erected a cotton press on the second, at an expense of from twenty to thirty thousand dollars. While thus in occupation with his partner, Henry D. Dardin, in October, 1841, he entered into two contracts with the defendant Joseph Delafield, claiming to be the agent of the Apalachicola Land Company for that purpose, for the purchase of said lots, so severally occupied by him. By the first of said agreements, purporting to be made between the Apalachicola Land Company by said Delafield, as their agent,

and the said plaintiff and Dardin, the latter became the purchasers of the wharf lot, or privilege in front of Palmetto street, for four thousand dollars, from the said company, who thereby agreed to make, or cause to be made to the purchasers, a *good and sufficient title* for the premises, upon the payment of the purchase money, in five yearly installments, beginning with the first of May then next, for which they took the notes of the plaintiff and Dardin, payable to the defendant Delafield and Mr. George Griswold. It was also agreed, that the company might sell such premises at the risk of the purchasers, to meet any of such notes not paid when due, and that, if at any time within twelve months, the purchasers should pay one half of the purchase money, they should be entitled to receive a deed, on executing a bond and mortgage for the remaining one half. The contract for the other lot was to the same effect, except as to the lots which were upland, and the price, which was three thousand dollars. In 1838, the owners of certificates of interest in said land under said agreement, amounting to more than two-thirds of all the shares, executed an agreement, dated the 28th of November in that year, by which they constituted the defendant Curtis and Mr. Griswold, trustees of said lands, in place of said McLane, Davis and White; directed the latter to convey the same to the former; required the former to execute an obligation, binding the company to carry out contracts made by the latter; limited their term of office to five years; but agreed that two-thirds of the stockholders in interest might, after a year, appoint new trustees, and alter or modify either the original agreement or that one. The directors were reduced also to two, besides the trustees. Simultaneously therewith, Messrs. McLane, Davis and White executed a deed of bargain and sale to Messrs. Griswold and Curtis, as joint tenants, in fee simple, of such part of the land conveyed to the former as remained unsold, for the use of the stockholders of the Apalachicola Land Company, and for the uses specified in the original agreement and in the instrument last above mentioned, both of which are recited in said deed. In 1843, the owners of certificates of interest in said lands, under the said original agree-

ment, amounting to more than two-thirds of all the shares, executed an agreement, bearing date the 27th of November of that year, whereby they constituted the defendant Delafield trustee, in place of the said Griswold; directed the latter to convey the legal estate in the lands left unsold, to the defendants Delafield and Curtis; limited the term of office of the latter to one year; enlarged the number of directors to seven, in addition to the trustees, and directed such trustees to convey to such persons as the directors might appoint. Simultaneously with the execution of such agreement, the said Griswold executed a conveyance in fee simple of all his estate in said lands to the defendants Delafield and Curtis, as joint tenants, for the use of the stockholders of the Apalachicola Land Company, and the uses of the original agreement respecting the same, and the other agreements hereinbefore referred to. In the years 1844, 1845 and 1848, three several agreements were entered into, signed by the proprietors of two-thirds of the certificates of interest in said land, described in the original agreement, professing to act by authority given by such instrument, by which Delafield and Curtis were continued in office successively, as it is therein termed; first, one year, from the 28th November, 1844; secondly, for the term of three years from the 28th of November, 1845, and finally, for three years from the 28th of November, 1851. On the eleventh day of December, 1838, the defendants Curtis and Delafield, the former trustee Griswold, Mr. Carnochan, one of the parties to the original agreement, and Mr. J. A. Johnson, named as directors in the agreement of November, 1838, passed a resolution appointing the defendant Delafield, their *general agent,* with a salary, but not otherwise defining his powers or authority. In the years 1836 and 1837, the proprietors of the said lands sold at public auction, in the city of Apalachicola, several lots out of them, including some on Palmetto street, at which sales three of the original proprietors and directors were present, and where such lots were sold according to maps, on which streets, plots, squares and wharf property were laid down, and the streets laid out down to the water, and the foot of the streets blocked off as wharf lots, including that

sold to the plaintiff, which faces Palmetto street. The city of Apalachicola brought suit for the wharf lots, except the plaintiff's, upon the ground of dedication by such maps, and recovered. One of the notes given for the purchase of the wharf lot, due on the first of May, 1844, for eight hundred dollars, was delivered by the defendant Delafield to J. Macpherson Berrien, Esq., in consideration of a debt due to him by the associates of said company, for professional services rendered by him, he having been counsel for the said company, which the plaintiff claims he took with legal notice of its original consideration. This note was placed in the hands of the defendant Selden, for the purpose of collection. The complaint alleged that large sums of money were received by the original trustees from the sales of said lands, which had come to the hands of the defendants Delafield and Curtis, and that nothing had been paid, as dividend, to the plaintiff or any other proprietor of certificates of interest in said land.

The plaintiff alleged that the associates of said company could not, as he was advised by counsel, convey a good and sufficient title to the lands, by reason of mortgages and other liens, or estates outstanding on said lands ; that Delafield and Curtis could not convey to the plaintiff, and that the plaintiff and other associates owned the lands ; that Delafield and Curtis had no authority to bind said associates or trustees by such contract, except under and by virtue of the terms of said articles of association, and that Delafield and Curtis were mere agents, to distribute the proceeds among the associates of the said Apalachicola Land Company, who are the real owners and parties in interest. That he was a partner with the other associates of said company, and that the associates of said company being indebted to Mr. Berrien, for counsel fees, transferred one of the notes to him, and he *took said note in payment for an antecedent debt incurred to him by said company, or their agents or trustees*, and he, therefore, prayed, that said Berrien be restrained from commencing any suit upon said note. The plaintiff alleged that he had paid two notes, each for $800, and one note for $750, together making $2350 ; and that he had had

the exclusive use and possession of the lands purchased for four-teen years, from October 11th, 1841; and was still in possession. He further prayed for a conveyance of the lands to him by a good and sufficient title, and that the defendants be decreed to pay back to him the amount of the notes collected, and be re-strained from collecting any more. He also prayed that Dela-field and Curtis might account for the proceeds of the sales of the lands sold and pay to the plaintiff his share thereof.

The answer of the company, by its trustees Delafield and Curtis, averred the perfect ability of the company to perform, insisted that by the terms of the contract, the plaintiff was bound first to pay the consideration money for which he had given his notes; his default in paying those notes; actions at law pending upon them, and the readiness of the company to give deeds on payment of said notes with costs, according to con-tract.

Berrien answered separately. He alleged, in his answer, among other things, that the promissory notes owned by him *were part of sundry notes received by him from the Apala-chicola Land Company, in satisfaction of a claim he had against said company, which was released and discharged by him (Berrien) in consideration of the transfer to him of the said notes by the company.*

A reply was put in, and proofs were taken. The judge, at special term, decreed a specific performance of the contract, upon payment of the consideration money remaining unpaid, by the plaintiff; that the plaintiff pay the promissory notes given for the consideration money, which still remained unpaid, with in-terest and costs of suits thereon; that Delafield and Curtis, trus-tees, should make and execute a good and sufficient deed of conveyance of the premises mentioned in the contracts and in the pleadings, to be approved by one of the justices of this court, and to be delivered to the plaintiff on payment of the amount due upon the notes, with the costs of the suits brought on said notes; also that the plaintiff pay to the defendants their costs of this suit.

*A. L. Robertson,* for the appellant.

*John Anthon,* for Delafield and Curtis.

*P. Y. Cutler,* for the defendant Berrien.

*John Townsend, Jun.,* for the defendant Selden.

By the Court, MITCHELL, J.   Previous to November, 1835, Peter, John, Thomas and Collin Mitchell, Richard Carnochan, Thomas Vermilyea, B. W. Rogers, John Graham and Benjamin Marshall were interested in lands in Florida, known as Forbes & Co.'s purchase, and amounting to about 1,200,000 acres. Their title had been in dispute, but was confirmed by a decision of the supreme court of the United States.   On the 28th of November, 1835, they agreed that each proprietor should vest, by regular deeds, the whole title to the lands, legal and equitable, in three trustees, and that the affairs of the company should be conducted by six directors, whose powers and duties were regulated by the articles of association.   The land thus conveyed was to be represented by scrip to be issued by the trustees to each proprietor in proportion to his interest in the land ; each share to consist of 500 acres, and the whole number of shares to be 2400 ; saving shares enough to satisfy a mortgage upon the land " so that the entire title" (to the land) " unincumbered, *in law and equity,* shall be fully, absolutely and unconditionally vested in the said *trustees,* that they may immediately make legal titles to all *purchasers,* and divide the *proceeds* among the stockholders."   The land was to be conveyed to Louis McLane, Charles Augustus Davis and Joseph M. White, to hold to them, their successors and the survivor of them in trust for the benefit of the proprietors, and in trust to convey the same in the manner prescribed in the articles.   Contracts for the sale of the lands were to be made by the board of directors, and notes and bonds to be taken by them, payable to the trustees ; and deeds of conveyance were to be executed by the trustees, or any two of them.   The trustees were to hold their

Wright *v.* Delafield.

offices for three years, at the expiration of which time the trust
was to close, unless renewed by a vote of the *directors*. After
the three years, the stockholders or *two-thirds of them in inter-
est* concurring, might alter or modify the provisions of that
agreement in such manner as they might think most condu-
cive to the interest of the concern ; provided that no alteration
should be made to change any contract for the hypothecation or
pledge of scrip for the payment of any loan to extinguish mort-
gages or other liabilities authorized by these articles.   In pur-
suance of this agreement, the proprietors, on the same 28th
day of November, 1835, by deed of that date referring to the
above agreement, and for the *purpose of making the land
available in the most expeditious manner*, and reciting that it
was to be conveyed to the trustees above named on certain
trusts specified in the articles, conveyed to the trustees " parties
of the second part, and to their successors, all their right and
title in law and equity" to said lands, " to hold to the use and
benefit of the stockholders" and to the several uses, interests
and purposes in the said memorandum of agreement set forth.
No words of inheritance, and no express words showing the
duration of the trust or of the estate granted, were expressly
used.   On the 28th of November, 1838, an agreement was signed
by the owners of 2233 out of 2400 shares, pursuant to the clause
contained in the original articles, modifying those articles in sev-
eral respects, and among others, appointing Lewis Curtis and
George Griswold trustees in place of the three trustees, and direct-
ing these last to convey to the two new trustees the *legal estate*
in the lands, and declaring that the new trustees should hold their
offices for the term of five years from the date of this last in-
strument, unless among other things, those articles should be
altered and new trustees appointed ; and also providing that at
any time after the first year " the stockholders, or two-thirds
of them in interest concurring," might appoint new trustees,
and alter or modify the provisions of the articles and of this last
agreement, in such manner as they might think most conducive
to the interest of the concern, but with the proviso contained
in the first articles.   The number of directors was reduced to

five, and it was made their duty to make sales of the lands in such manner; and to such persons, and for such prices, and to take such security, as the majority of the directors should think proper. They also had power to appoint a secretary, and such surveyors and other assistants as might be necessary, and in general to do all things necessary and proper to carry the objects of the trust into effect. The trustees were to make conveyances to such persons as the directors should order and direct. On the 29th of November, 1838, by deed reciting, in substance, the articles of agreement, the deed of 28th November, 1835, the instrument of 28th November, 1838, and its direction to the original trustees to convey, the said trustees conveyed to Lewis Curtis and George Griswold, their *heirs and assigns*, all and singular the said tract of land, and all the estate, &c. of the said three trustees, to hold to the new grantees, their heirs and assigns, as joint tenants and not as tenants in common, in trust for the use and benefit of the stockholders and for the purposes in the original instrument, and in the instrument altering it, set forth.

Subsequently, on the 27th of Nov. 1843, the articles were again amended, by the concurrence of at least two-thirds in value of the share owners. The secretary of the company, the case says, testified that the several amendments were signed by two-thirds of the stockholders in *value ;* he did not know if they were two-thirds in *amount.* If they were two-thirds in value they must have been two-thirds in interest, and the secretary must have meant, by two-thirds in amount, two-thirds of the number of the stockholders. They were again amended June 26, 1845. The conveyance to Curtis and Griswold must have been known to the shareholders, and also the subsequent one to Curtis and Delafield. These amendments recognize and ratify these conveyances. The amendments of 27th Nov. 1843 refer to the original articles and their amendments, and renew and continue in force the said articles of association for one year from the 28th of Nov. 1843, and appoint Delafield and Curtis trustees ; the former in the place of Griswold, " who is directed to convey to Delafield and Curtis the legal estate, so

far as the same is vested in him." On the execution of which conveyance, &c. Delafield and Curtis are directed to deliver to Griswold an obligation binding the company to execute all contracts made under, and duties imposed by, the articles of association and by-laws, upon said Griswold as trustee. The new trustees were to continue for one year. The duty of the directors to make sales, and of the trustees to execute deeds, is repeated, but no deed is to be ordered "until the purchase money be paid," or the "residue unpaid be secured by a bond or note, with a mortgage on the premises." The amendments of Oct. 7, 1844, continue the articles as amended, for one year from Nov. 28, 1844, and declare that "*Delafield and Curtis are hereby continued in office as trustees for the term of one year* from the 28th day of Nov. 1844." The amendments of 26th June, 1845, continued the articles for three years from 28th Nov. 1845, and declare that "Joseph Delafield and Lewis Curtis are hereby continued in office as trustees for the term of three years from the 28th day of Nov." 1845. The articles were again amended on the 4th of Nov. 1848, and Delafield and Curtis were reappointed and *continued* trustees for the term of three years from 28th Nov. 1848.

The object of the association was to transfer the legal title to trustees, so that they could sell and give a good title to purchasers, without the intervention of the proprietors, and notwithstanding any change in the ownership of the shares. To effect this, it was necessary that the fee should pass to the trustees. If the original deed failed to give them the fee, for want of words of inheritance, a court of equity would have reformed it in that respect. The parties, in effect, did the same thing. The original trustees having conveyed to the second set of trustees with words of inheritance, *two-thirds* in interest of the shareholders, under the power in the original articles to alter and modify those articles, directed Griswold to convey the *legal estate* to Curtis, as trustee in his place, and Griswold accordingly conveyed to Curtis, with words of inheritance. The like two-thirds in interest of the shareholders, who must be assumed to have known the nature of the con-

veyance to Delafield and Curtis, and that it was in fee, in 1844 and 1848 expressly declared that " those gentlemen were thereby *continued* in office as trustees." This was a recognition of them as lawfully existing trustees, with such estate as was granted to them, and a reappointment of them with the like estate. It was a confirmation of the conveyance to the new trustees, and bound the two-thirds in interest who concurred in it, and by virtue of the powers vested in such two-thirds by the original articles, bound also the other shareholders; especially as it was in conformity with the actual intention of the original articles.

The trustees, therefore, can give a good, legal and equitable title to a purchaser, unless it be affirmatively shown that there was some defect in the original title of the proprietors ; or that any parcel of land is incumbered; or that the trust deed is void.

The cause was tried at special term, and the facts tending to show the objections to the title there proved. The only evidence of a defect in the title of the trustees related to a portion only of the lands ; and showed that the city of Apalachicola brought ejectment, in the spring of 1848, against Day & Co., in place of whom Curtis and Griswold, as such trustees, as before mentioned, were admitted to defend, as the landlords; that the premises then in controversy were lands lying at *the foot* of Florida promenade, bounded on the sides by wharf lots Nos. 6 and 7 ; at the foot of Leslie street, bounded on the sides by wharf lots Nos. 12 and 13; and at the foot of Center, Chestnut, Palmetto, Cypress, Juniper, Fulton, Monroe, Franklin and Jefferson streets ; each lot bounded on the sides by wharf lots of certain numbers; the land at the foot of Palmetto street being bounded on the sides by wharf lots Nos. 28 and 29; and that the city, on a trial upon the merits, recovered those lands, and was put into possession of all except the lands held by the plaintiff. Part of the evidence in the case is given in the record of that trial. Among the evidence was the above deed to the original trustees, and the deed from them to Curtis and Griswold, and a deed from the two last trustees to Nourse and

Wright *v.* Delafield.

Brooks, conveying a lot in Apalachicola by a map on file in the city council, bounding it by Water street, Chestnut street, and other lots on said map ; Chestnut street running down to the river. The court must have held that Curtis and Griswold were the landlords by the law of Florida, when it admitted them to defend as such ; and thus included a decision that the trusts under which they held were legal by the laws of Florida, and that they had the legal estate, and not a mere power. No evidence of title on the part of the city seems to have been produced. It may therefore be inferred that the court held, 1st. That the trustees on behalf of the association making a map of that part of their lands, laying them out with streets, and selling by such map, thus dedicated the streets to the *public ;* and 2dly. As the lots claimed in that suit were all at the *foot* of such street, and bounded *by wharf lots on their sides,* that the court also held (as is held in favor of this city) that the slips extending at the *foot* of streets, and in continuation of them, and the wharves erected over such slips, belonged to the city ; unless, in the maps laying out the property, or in some other equally notorious way, such slips and wharves were reserved for the original owners. The lands which the company agreed to convey to the plaintiff and Dardin are described in the agreement as in *front* of Palmetto street, marked F. on the city map, and lying between wharf lots Nos. 28 and 29 of said map. The lands in the ejectment suit are described as at the *foot* of Palmetto street, and as bounded on the sides by wharf lots Nos. 28 and 29. The descriptions seem to be nearly the same ; especially if Palmetto street runs *to* the river, and not along or parallel with it. Yet it was stated, in substance, on the argument, and not denied, that these are different lots. If they are the same, does that decision control as to the lots in question ? It would if that action properly brought the title to *these* lots in issue. But the action was ejectment in its old form, in which Richard Roe, lessee of the city of Apalachicola, was plaintiff, and John Doe defendant, and the latter gave the ancient friendly notice to J. Day & Co. *tenants in possession,* to come in and defend. The *possession by those tenants,* ac-

cording to that form of action, limited the extent of the recovery; and although lands not occupied by such tenants might be described in the declaration in ejectment, yet as the tenants of these latter lands would have no notice of the action, the judgment could not affect the title to them. Accordingly, the plaintiff's evidence shows that while possession was given to Nourse and Brooks as agents of the city, by the marshal, of the other lands described in the ejectment suit, it was not given of the lands held by the plaintiff and Dardin, but that they retained and still retain the possession, notwithstanding that recovery. The plaintiff does not, in his complaint, pretend that there has been any recovery against him by the city of Apalachicola, or by any one else, of the lands held by him under the company. The plaintiff's witness, Porter, states facts which may well account for a decision in his favor if he had been a party to that suit, and against Day & Co., and against the trustees as to certain other streets and lots at the foot of those streets. He says that in 1835, 1836, 1837 and 1838 the trustees made sales of lots in the city of Apalachicola, at auction, and sold by a map, on which streets, plots, squares and wharf property were laid down; that at the first sale, the streets were laid out *to the water*, but at the second sale the *foot of each street was blocked off as wharf lots*, and that the wharf lot of the plaintiff was one of the lots so blocked off. This blocking off of the plaintiff's wharf lot was an open and public notice that it was reserved by the trustees for their benefit, and that it was not to be dedicated to the public, and they saved it to the company.

The plaintiff, also, in his complaint, had specified the defects in the company's title, on which he relied—that the associates of the company could not convey a good title by reason of mortgages and other liens or estates *outstanding* in said lands. The term *"outstanding in* the lands," and the connection of it with the words *"mortgages and liens,"* shows that the defects intended were *incumbrances* on the land, and not a total want of title. The plaintiff's objections should be confined to those, unless he clearly made out an actual want of title, and in such a way as not to surprise the defendants.

Wright *v.* Delafield.

The complaint also alleges that Delafield and Curtis cannot convey a good title. But this refers to the supposed invalidity of the conveyance to the trustees. There is no proof that the mortgage referred to in the articles of association covered the property now in suit ; and it is not to be inferred without proof.

The next question is as to the validity of the trust deed. As already stated, there is some proof that the deed was held to be valid by the laws of Florida, in the ejectment suit. The broad proposition has been pressed on the court that the law of our own state is. to be deemed the law of other states, unless proof to the contrary be shown ; and that this is so, even as to our statutes, and even as to those relating to titles to lands and to trusts. If that were so, the proof in the ejectment suit would change the burthen. But the rule is too broadly stated. The true rule assumes to be founded on a probability that it will lead to the actual truth, and is not a technical rule forced upon courts against their conviction of what is right. Until the contrary is proved, it is more ·likely to be true than false, that the laws of another state are the same as ours, as to contracts relating to personal estate, and as to commercial matters particularly ; and that when the common law is known to prevail it is construed there as it is with us, whether relating to lands or personal property. So also, interest is now considered as much an incident to a loan of money as rent is to the letting of a house or of lands. It is therefore an assumption most compatible with truth, that interest at *some rate* is allowed in every state. Although the *rate* of interest, therefore, is fixed by statute, yet as some rate is universal, our courts must allow some rate ; and if the parties furnish no better guide to the truth, the court assumes ours to be the legal interest, in computing the amount to be recovered. But when we introduce what we know to be a new law, (as is our statute respecting trusts,) it would be a perversion of reason to pretend to infer that as soon as we placed the new law on our statute book, every other state in the union and in the world would adopt the same law. Slavery was abolished here in 1826. It would be a bold proposition that we should infer that it was thenceforth abolished in

all the other states in which it was proved to have previously existed. Within the present century we. have adopted laws giving priority to conveyances of lands according to the order of time in which they are recorded ; creating liens in favor of mechanics ; at one time making banking a monopoly—afterwards opening it to all, under certain restrictions. Many of the states have by express statute, adopted similar laws. He would be a very unwise man who, inferring that our sister states had conformed their laws to ours, should make his investments accordingly. And it would be no less unwise and unjust in a court, to make the same inference, and on it to determine the rights of parties. Any conclusion which shocks reason and common sense cannot be founded on correct rules of evidence.

The cases quoted are generally consistent with the above principles. In *Dollfus* v. *Frosch,* (1 *Denio,* 374,) it was *said* that we must presume ·that the law of France allows three days of grace on bills of exchange. In *Leavenworth* v. *Brockway,* (2 *Hill's Rep.* 201,) the same principle was applied, and it was held that it was to be presumed that the law of Ohio, as to the steps necessary to fix an indorser of a note was the same as the law of this state. (*So also Brown* v. *Gracey,* 16 *Eng. Com. Law. Rep.* 426 ; 2 *Dowl. & Ry.* 41 *in note.*) See, however, the note to 2 *Hill,* 202, which shows that in Illinois (in *Mason* v. *Wash, Breese's Rep.* 16,) inasmuch as a statute of Illinois required things to be done to charge an indorser, more than the common law requires, the court there inferred that the laws of this state conformed to the Illinois statute ; and that in South Carolina it was held, in *Allen* v. *Wilson,* (2 *Hill's So. Car. Rep.* 319, 322,) that the plaintiff could not recover money won at a faro table, as gambling was unlawful by the statutes of South Carolina. And see also *Harris* v. *Allnut,* (12 *Loui. Rep.* 465,) there referred to. The case in South Carolina is analogous to one that had been decided in England, and may be reconciled on the idea that gambling is immoral, and injurious to the community, and that therefore the courts of any state which condemns it, cannot sanction a recovery on such a consideration.

Wright *v.* Delafield.

In *Hosford* v. *Nichols,* (1 *Paige,* 226,) the chancellor, holding that it could not be alleged that a mortgage given in Pennsylvania, on lands in New York, pursuant to a contract made in New York, would be void for charging seven per cent interest, said that it did not appear that the laws of Pennsylvania made void contracts for more than six per cent; and that courts of this state cannot take notice of the laws of other states, unless they are *proved* in the same manner as other facts; citing 8 *John.* 189; 2 *Cranch,* 186.

In *Thompson* v. *Ketcham,* (8 *John.* 189,) which was an action on a promissory note made by the defendant, an infant under 21 years of age, in the island of Jamaica, the court refused to take notice of what the law of that island was, as to infancy, and did not assume that it was the same as ours; the court saying that it lay with the defendant to show that his plea of infancy was good by the law of Jamaica, and that the court are not to know that fact without proof; that it is "the duty of the party who interposes a defense to a contract otherwise binding, to prove every thing requisite to the validity of the defense."

In *Robinson* v. *Dauchy,* (3 *Barb. S. C. Rep.* 29,) an action claiming to recover goods on account of fraudulent representations of the purchaser, the court said "*prima facie* the law of Massachusetts, where the fraud was committed, is like our own, and when no proof is given on the subject, our courts will act on their own laws." So far as relates to the effect of fraud, at common law, this was undoubtedly correct, as we know that the common law prevails in that state.

In *Abell* v. *Douglass,* (4 *Denio,* 305,) the plaintiff sued to recover moneys paid by him to the defendant. One objection to his recovery was that they were paid voluntarily, with a full knowledge of all the facts of the case. The defendant and others had joined in a purchase of lots at Erie, Pennsylvania, with a view to speculation. The title was taken in the name of McCluer, who held it for the benefit of, and under a trust (probably secret and not in writing) for, those who advanced the purchase money. The plaintiff, after this, bought (by verbal

agreement) the defendant's share in the purchase and gave his own notes for the amount, which he afterwards paid. He sued for the money thus paid. It was shown on the trial that the statute of frauds of Pennsylvania made void all sales by parol of any *legal* estate in lands. No statute of that state was proved making void the sale by parol of *equitable* interests in lands; and decisions of the courts of Pennsylvania were referred to by our court, (not proved on the trial,) that such sales were valid. If our statutes respecting lands and as to trusts are to be presumed to be the law of other states, then, as only a certain section of the Pennsylvania statute was proved, and it was not proved that their statute of frauds, and as to trusts, had not all the provisions of our statutes, it would have followed that as our statute prevents any trust resulting in favor of the person who has paid the consideration money for land when he has allowed the title to be taken in the name of another, the defendant had no legal or equitable title to the lands. (1 *R. S.* 728, § 51.) See also, our statute making void generally parol trusts as to lands. (2 *R. S.* 728, § 51.) And as our statute relative to trusts allowed only certain express trusts, among which was not included a trust to sell or hold for the benefit of the owners of the land, (1 *R. S.* 728, § 55,) the trust under which McCluer held, if it were express, would also be deemed void, until it was proved that there was no such statute in Pennsylvania; just as is contended by the plaintiff in this case. But the court took no such view of the law. They said " we are to assume that the *common law* was in force in Pennsylvania; and as far as appears by the evidence given on the trial, there is nothing in the statute law of that state to prevent a transfer by parol of the defendants' *equitable* interest in the land being as effective as a transfer in writing would have been." Thus they assumed the common law to exist in another state, until the contrary was proved, and did not transfer our statute law to a neighboring state, as part of its law. Taking the decisions of our own state as the guide, this is clearly the rule in our state.

But if our statute law were to prevail, the result would

Wright *v.* Delafield.

not, be different. The revised statutes have declared that words of inheritance shall not be requisite to convey an estate in fee, and that every grant of real estate shall pass all the estate of the grantor, unless the intent to pass a less estate shall appear by express terms, or be necessarily implied in the terms of the grant. (1 *R. S.* 748, § 1.) This would give to the first three trustees the fee in the lands. They also declare that when an express trust is created for a purpose not enumerated in the article on trusts, it shall be valid as a power in trust if it authorizes the performance of any act which may be lawfully performed under a power. (1 *R. S.* 729, § 58.) The article on powers describes a general power as one which authorizes an alienation in fee to any person whatever; (*Id.* 732, § 77;) and declares a general power to be in trust when any person other than the grantee of the power is designated as entitled to the proceeds or other benefits to result from the alienation of the lands. (*Id.* 734, § 94.) All the trust deeds refer to the articles of association, and show that the trustees were appointed to sell the lands, and that persons (other than the grantees of the power, who were the trustees,) were designated as entitled to the proceeds, namely, the *grantors* of the estate and power. The deed was therefore valid as a power in trust. Sections 102, 108 and 134 of the article on powers, together with other sections in the same article, and the adoption of sections 66 to 71 inclusive, of the article on trusts, show that a power in trust is not (like a mere power of attorney to convey lands) revoked by the death of the grantor of the power, or a sale of his interest; but that the power still continues until it is revoked pursuant to an authority contained in the instrument creating the power. The present trustees could, therefore, under our laws, give a good title by virtue of the power in trust granted to them.

There is another answer to the plaintiff's objection to the title of the trustees. He made his written contract to purchase from the company in Oct. 1841, and whether he took possession before or after that time, he has held under the company ever since, and shows no other title under which he pretends to hold. The

evidence shows that no one claims adversely to the company any part of the wharf lots, except that the city claims and has recovered as by dedication from the trustees, those wharf lots, which on the maps were laid out as open to the public. The plaintiff, with a knowledge of the sales made by the trustees, under which this dedication was inferred, contracted to buy those lots of the company, in 1841; he at that time being also an owner of 11 out of 2400 shares of which the whole property consisted. He remained in possession under the trustees, as was shown by his paying the first three installments which by his contract he was to pay, viz: $800 in May, 1842, $800 in May, 1843, and $750 in October, 1843. He still continues in possession, and it must be under them, since he does not show any other proprietor under whom he holds. The rent he has received has been (at one time at least) $3000 per annum. Under these circumstances he cannot refuse to pay the consideration agreed on for his purchase, unless he offers to rescind the contract and deliver up the property. This he has never done, and shows no disposition to do now. He cannot keep the land and refuse to pay for it; whether the title be good or bad. If it is bad he must elect to take it as it is, or as the associates can make it, and pay for it, or else to give it up and account for the rents and profits. As he does not elect to do the last, he must pay for the land. The prayer of his complaint is not that the contract may be rescinded, but that the trustees *may account* for the proceeds of sales made by them, and may be decreed to convey the lands to him by a good and sufficient title, and to relieve it from incumbrances or outstanding claims, and repay to him the amount paid by him, &c.; and that the trustees be removed and new trustees be appointed, &c.

The plaintiff objects that the agreement with him was signed not by the board of directors, but by Delafield whom they had appointed their agent, and that they had no power to appoint an agent with power to contract to sell. If this be so, and the plaintiff is not bound by the contract, then he can come into court only on the ground that neither he nor the company

Wright *v.* Delafield.

is bound by the contract. In that case he is still bound to pay his notes, unless he offers and is willing to give up the lands and to account for the rents and profits. This he shows no inclination to do. His prayer is not to rescind the contract, but for a specific performance of it. He thus adopts it as a valid contract, and the company do the same, by recognizing the acts of Delafield, and insisting on the plaintiff's performance of it; by accepting the payment of some of the installments, and using and appropriating as their own the notes given by the plaintiff for the residue of the purchase money. Under the power in the directors " to appoint a secretary and such surveyors and other assistants as might be necessary" they could appoint an agent who should sign contracts, on such terms as should be previously authorized by them. It is to be presumed this was done in this case.

The plaintiff also claims that he is entitled to an account of the general proceeds of sales. This has been given in general terms, in the evidence at special term; it being shown that such accounts have been rendered periodically, and that the expenses and payments exceeded the amounts received. Generally, the question whether a good title can be made is to be passed upon before a referee, and so also is an account to be taken before him. But the parties may, if they choose, and the court consent, have the same matters inquired into by the court. This course was adopted in this case.

The plaintiff had been sued upon some of the notes given for the installments yet unpaid. Costs were incurred in those suits, and they were stayed by injunction in this action. The merits of the defense in those suits were necessarily gone into, on the trial of this action, and were found against the defendant. This court was bound to decide on what terms the plaintiff was entitled to the specific performance for which he asked. Certainly he was to pay the notes, and interest thereon, and also the costs unnecessarily caused by him in those actions, before he could be entitled to a deed. These are the terms imposed by the special term, with this addition only, that it is made imperative on the plaintiff to pay those notes, as it is also on the trustees to convey the lands to him by a

good and sufficient deed of conveyance. This affirmative relief it was in the power of the court to grant to the defendants. It was also proper that the plaintiff should pay the costs, as he failed in showing any fault in the company.

With the views before stated, it is not necessary to notice the claim of Mr. Berrien to hold the notes as a bona fide purchaser. He received them, as he says, before maturity, in satisfaction of a debt previously due to him by the associates, for counsel fees. His counsel insists that the rule in *Coddington* v. *Bay*, (20 *John.* 637,) and in *Stalker* v. *McDonald*, (6 *Hill*, 96,) only applies where a note is taken as collateral security for an antecedent debt, and not where it is taken in payment, or satisfaction, of such debt. Such was not the opinion of the chancellor, in the last case. (*See particularly*, 6 *Hill*, 102.) The reason of the rule applies equally to each case. It is that the receiver of the note is to be protected only when he has lost his property or security by reliance on the note, without notice of any defense of the maker, to it. As soon as it should be ascertained that such defense existed, the receiver of the note would be restored to his original cause of action against his debtor, and so would sustain no loss, beyond that which would result from delay; for which the maker of the note should not be accountable. *Youngs* v. *Lee*, (2 *Kern.* 551,) professed to be in accordance with those cases. It did not intend to overrule them, or to give a new interpretation of them, and therefore, if not in accordance with them, is an accidental omission to apply the principles of those cases, but not a reversal of them. But in this case, if the title to the lands should fail, it does not appear but that the plaintiff has received a full equivalent for the notes given by him, in the use and enjoyment of the lands, the possession of which he still retains. He cannot, therefore, resist the payment of the notes.

The parties have chosen (probably because they relied on certain points of law as clearly in their favor,) to leave several matters of fact in comparative obscurity which might be easily cleared up. Among these, is the law of Florida as to trusts, and as to the words necessary to create an estate in fee; and

whether the common law or the civil law prevailed there, at the time of these conveyances; also whether the actual recovery in the ejectment suit was of these or of other lands only; and if so, whether by the law of Florida the recovery is limited to lands of which the tenant to whom the notice is given is in possession, or includes all lands described in the action. The court has decided on the evidence before it. It may still be expedient for the parties to ascertain the precise facts in all those respects, and to insert them in the case.

The attention of the plaintiff is drawn to the fact that he has made no formal case; that he has not excepted to the finding of the special term, and has not procured there any finding of the facts and the law.

The judgment of the special term should be affirmed, with costs.

[NEW YORK GENERAL TERM, February 12, 1857. *Mitchell, Roosevelt* and *Davies,* Justices.]