Farrington *v.* Frankfort Bank.

---

FARRINGTON *vs.* THE FRANKFORT BANK.

Where negotiable paper, obtained from the party executing it by means of fraud, is parted with to an innocent holder, in the usual course of trade, for a valuable consideration, such holder will be protected.

But the valuable consideration must be either a new advance, made at the time; or some prior security must be parted with; or an existing indebtedness actually discharged, in order to complete the title of the holder.

Where the plaintiff was induced, by the false and fraudulent representations of the drawer of bills of exchange, to indorse the same for his accommodation,

Farrington *v.* Frankfort Bank.

and the bills were thereupon delivered to the cashier of a bank which then held protested drafts drawn by the same drawer upon the same drawees; there being no agreement between the drawer and the cashier that the new drafts should be received by the bank in *payment* of the protested drafts, but the same were procured by the drawer and delivered to the cashier with the intention that they should be held as additional and collateral security to the protested bills; and the new drafts were subsequently passed to the credit of the drawer, on the books of the bank, and he was charged with the protested bills, and the latter were stamped with the canceling iron of the bank, but still remained in its possession; *it was held* that the plaintiff's indorsement, having been obtained by fraud and misrepresentation, was to be deemed void as against him; and that the bank was not entitled to protection as a *bona fide holder* for a valuable consideration and without notice.

*Held also,* that the plaintiff might maintain an action against the bank to have the indorsements declared void in its hands, to restrain the collection of the bills, and to have the indorsements erased therefrom.

APPEAL from a judgment entered at a special term, after a trial at the circuit. The complaint alleged that the firm of Osborn, Turnbull & McDonald, a produce firm in New York, was insolvent on the 17th January, 1856, and that the cashier of the defendant knew that fact; that on the 14th of January, drafts on the firm, accepted by them, and on which the defendant had advanced money, came back protested for non-payment, and remained unpaid, which was also known to the defendant's cashier, but all these facts were unknown to the plaintiff. That on the 17th January, 1856, Simeon Osborn, jun. a member of said firm, and Mr. Pomeroy, the defendant's cashier, came to the dwelling of the plaintiff, and Osborn requested the plaintiff to indorse two drafts, drawn by Osborn on the firm—one for $2000 and one for $2500—and to induce him to do so, made certain representations in reference to the solvency, &c. of the firm and of Osborn individually, relying on which the plaintiff indorsed the drafts in question, and they were delivered by Osborn to the defendant. That the defendant parted with no value or securities for the draft; that the indorsement was for the accommodation of Osborn and the firm, and without consideration; and that Osborn came at Pomeroy's solicitation, Pomeroy knowing that the firm was insolvent. That Osborn's representations were false, and the firm had then failed and made an assignment,

and Osborn's individual property was covered by mortgages and judgments. Judgment was prayed, declaring the drafts void in the defendant's hands, and a preliminary injunction restraining their negotiation, &c. The answer alleged that the firm's acceptances had been protested before, without impairing their credit or solvency; and that on the 9th of January, 1856, a draft for $2000, and on the 15th of January, 1856, another draft for $2500, accepted by the firm, and which had been discounted by the defendant, were returned protested for non-payment. It also denied all complicity (or knowledge on the part of the bank or Pomeroy, of any of the facts tending to establish any complicity) on the part of the bank or Pomeroy, in the alleged misrepresentations of Osborn &c., or any guilty knowledge &c., and put in issue the plaintiff's ignorance and Osborn's knowledge of the condition of the firm, &c. It then alleged that the cashier had no knowledge or suspicion that Osborn was about to make or did make any true or false representations, and put in issue the fact of the representations having been made. It also alleged that on the 17th of January, before the drafts in question were made or indorsed, Osborn and the cashier had made an agreement that Osborn should furnish to the bank such drafts as he did furnish, indorsed by the plaintiff, and that such drafts should cancel and pay the two protested drafts above mentioned; that Osborn furnished the drafts pursuant to the agreement, and on receipt of them the bank canceled the old drafts, and received the new drafts in full payment thereof, and so parted with securities &c., by releasing Turnbull and McDonald, two of the acceptors of the protested drafts. It alleged, on information and belief, that there was a full consideration for the indorsement, moving from Osborn to the plaintiff, and put in issue the material facts touching the insolvency &c. of Osborn and the firm. The cause was tried at an adjourned circuit, in Herkimer county, in May, 1856, before Justice PRATT, without a jury.

The following facts were found by the judge: Previous to January 17, 1856, the firm of Osborn, Turnbull & McDonald had been engaged in business in the city of New York, in the purchase and sale of butter and cheese; and in such business had,

Farrington *v.* Frankfort Bank.

from time to time, obtained money from the defendants upon drafts drawn by Simeon Osborn, jun. a member of the firm, who resided in Herkimer county, upon the firm in New York, and which drafts-were accepted by the firm. On the 17th of January, 1856, the said firm were indebted to the defendants upon such drafts, in about the sum of $17,500, none of which were due except two drafts, amounting in the aggregate to $1400, which had been protested for non-payment; one on the 9th and the other on the 15th day of January. On the said 17th day of January, Mr. Pomeroy, the cashier of the defendants, hearing that the firm was in a very precarious condition, called upon the said Simeon Osborn, jun. and pressed him for further security, and for that purpose went with him to the house of the plaintiff, to solicit him to become indorser for said firm. Osborn, in a private interview with the plaintiff, solicited him to indorse for them to the amount of $4500, and to induce him to do so, represented that they were under temporary embarrassments merely; that there would be no risk in indorsing; that the firm, as well as himself, individually, had ample means to secure him if the firm should become more embarrassed. Induced by these representations, the plaintiff indorsed, in blank, the two drafts in question, drawn by the said Simeon Osborn for $4500, which were delivered to the said cashier. The representations made by said Simeon Osborn to the plaintiff were untrue in fact; the said firm at that time having actually suspended, and being at the time largely insolvent, and the firm and the said Simeon Osborn individually having assigned and otherwise encumbered all their property for the benefit of other creditors of the firm. The cashier had no actual knowledge of the misrepresentations of Osborn to the plaintiff. There was no agreement between Osborn and Pomeroy, that the said drafts should be received by the bank in payment of the drafts then under protest, but the same were procured by Osborn and delivered to Pomeroy with the intention, on the part of Osborn, that they should be held as additional and collateral security to the indebtedness then existing against said firm in favor of the defendants. Pomeroy, on the 19th of January, and before the service of the injunction in

this cause, passed the drafts in suit to the credit of Osborn upon the books of the bank, and charged him with the protested drafts, and stamped them with the canceling iron, which drafts have since remained and are now in possession of the defendants. Upon these facts the judge found as matter of law, that the drafts not having been delivered to the defendants upon any new consideration or credit, nor in payment of any antecedent indebtedness; and the indorsement of the plaintiff having been obtained by misrepresentations, the same should be deemed void, as against the plaintiff, in the hands of the defendants. The plaintiff was therefore declared entitled to the relief prayed for in the complaint, without costs to either party. A judgment was accordingly entered, by which it was adjudged, declared and determined, that the said indorsements by the plaintiff were null and void as against the plaintiff; and the defendant, its officers and agents, were perpetually enjoined from enforcing the collection of said drafts, or either of them, by suit or otherwise, against the plaintiff; and from bringing any action at law or equity against the plaintiff upon the said drafts, or either of them; and the plaintiff was adjudged and declared to be freed and discharged of and from any liability on account of said indorsements. And it was further ordered, adjudged and determined, that the defendant be ordered and directed to erase the plaintiff's indorsements upon said drafts.

From this judgment the defendant appealed.

*R. Conkling*, for the appellant.

*F. Kernan*, for the respondent.

W. F. ALLEN, J. The bills in question, with the indorsement of the plaintiff, came into the possession of the defendant on the day of their date, (January 17th, 1856,) and this suit was commenced and the preliminary injunction served two days thereafter, (January 19th.) As the circumstances under which the indorsements were obtained, if as alleged by the plaintiff, would not constitute a defense to an action at the suit of a bona

fide holder for value, this action was necessary to the protection of the plaintiff and was properly brought, and may be sustained, if the evidence sustains the allegation of fraud, and the defendants are not holders for value without notice of the fraud by which the plaintiff was induced to make the indorsement. Although, in case the defendant should continue the holder of the bills until after they matured, the plaintiff might, if his allegations are true, defend himself at law in any action to be brought, as against him, the defense would be of no avail as against any other person or corporation to whom the defendants might transfer them before due ; and hence this action was necessary and proper. (*Reed* v. *The Bank of Newburgh*, 1 *Paige*, 215. *Coddington* v. *Bay*, 20 *John.* 637. *Hamilton* v. *Conway*, 1 *K.* 517.) That the indorsements were procured by a very gross fraud, is very clearly established by the evidence, and is not disputed by the counsel for the appellants. With this part of the finding of the justice, upon the trial, no fault was found upon the argument of the appeal, either in the printed points or otherwise; but on the contrary, it was conceded that the plaintiff was induced to indorse the bills by the false and fraudulent representations of the drawer, substantially as stated in the complaint, so that we are relieved from the examination of this branch of the case.

The serious question, and indeed the only question, upon the merits, is that arising out of the evidence of the circumstances and considerations of the transfer of the paper to the defendant ; and upon this point there was some circumstantial but no substantial difference in the testimony of the two principal witnesses of the respective parties. The substance of the transaction is the same as detailed by both the witnesses. The drawers of the bills indorsed by the plaintiff were, at their date, indebted to the defendants to a large amount, upon negotiable paper not yet due, and to the amount of $4500 upon paper over due and under protest, and were in bad credit and actually insolvent. The drafts, with the indorsements of the plaintiff, were procured in order to provide for the debt past due which was represented by two bills of Osborn's on the firm of Osborn, Turnbull &

McDonald, for $2000 and $2500, respectively, and that indebtedness constituted the only consideration of their transfer to the defendants. The protested drafts were not delivered to the parties at the time of the transfer of the new bills, but on the evening of the 19th of January, a short time before the service of the papers for the commencement of this action, the parties to the old drafts were credited with the avails of the new, and charged with the old, together with the expenses of the protest, &c., and the latter were marked or cut with the canceling iron of the bank and placed in a drawer with papers of the like character, where they remained up to the time of the trial. This was the transaction, and it must speak for itself. It was carried out, in substance, according to the understanding of the parties. There was no express agreement that the new bills should or should not be taken in absolute payment of the protested paper, or as collateral security for it. It was, doubtless, the understanding of both parties, that the debtors should have the benefit of the new paper in liquidation of the old, that the difference in amount between the two, growing out of the accumulation of interest, protest &c., should be settled and paid by the parties liable. The form which the transaction took upon the books of the defendants, and the disposal of the pretended paper, was the result of an orderly and proper method of bookkeeping and the course of business which was deemed proper by the officers of the bank under the circumstances, rather than by any express agreement between the parties.

Whether a title acquired under these circumstances, and upon this consideration, is a valid title as one acquired *bona fide* and for value, and perfect as against the equities of the plaintiff, is the principal question made upon the appeal; for although the counsel for the respondents makes a point upon the complicity of the cashier and the defendant in the fraud perpetrated upon the plaintiff, there is no proper allegation of such fraudulent combination, in the complaint, and the judge at the circuit did not base his decision upon any such fact; and it is not therefore deemed necessary to examine the evidence which it is

Farrington *v.* Frankfort Bank.

claimed bears upon the question. In other words, as the case comes before us that question is not in it. That a holder for value can alone retain as against the defrauded party, or enforce the collection of, negotiable paper procured by fraud, is not questioned. (*Rogers* v. *Morton*, 12 *Wend.* 484. 14 *id.* 575.) It is conceded that something more is necessary to support the title of the holder, as against the true owner who has been fraudulently deprived of negotiable paper, or against the parties to such paper, obtained by fraud or without consideration, than that which must be sufficient as a consideration to support a transfer as between the parties negotiating it. In this case the bills were transferred to the defendants in the ordinary course of business and upon a good consideration as between them and Osborn, who, in the absence of any fraud, was fully authorized to deliver them to the defendants, so as to bind the plaintiff as indorser; but the question is whether they were transferred for value given at the time, so as to protect the defendants against the equities of the plaintiff. The general principle is settled in the case of *Bay* v. *Coddington*, (5 *John. Ch. Rep.* 54, *and* 20 *John.* 637,) that the consideration which will protect the indorser of negotiable paper against the latent equities of parties or third persons, must be something of value parted with in fact at the time, in money or property—some responsibility incurred—or some right relinquished, upon the faith and credit of the paper. This is fully recognized in all the cases to be found in our books, and the only difficulty has arisen in the application of this principle to the circumstances of each case. A precedent debt, when the note or bill is taken in payment and satisfaction of it, and securities are given up or lost in consideration of the transfer, has been held a sufficient consideration as a present parting with value on the faith of the note. One difficulty in this case is in the want of evidence that the bills in question were taken in payment of the precedent debt of Osborn, so as to bring this case within the principle contended for. The judge has found that they were not so taken, and his conclusion appears to be warranted by the evidence, and the course of the decisions in this state. As be-

tween the defendant and these original debtors, it could not have been claimed by the latter, under the authorities, that their liability was discharged by the transfer of these drafts, unless payment resulted from them. There was certainly no express agreement that they should be received in absolute payment. Upon the refusal of the drawees to accept, or upon the dishonor of the bills at maturity, the defendants could have resorted to the original liability of the debtors, and maintained an action against them upon the protested drafts. *Olcott* v. *Rathbone,* 5 *Wend.* 490. *Cole* v. *Sacket,* 1 *Hill,* 516.) The new bills were but the bills of the debtors themselves, and not the paper of a third person. The plaintiff was the accommodation indorser of the debtors, and was known by the defendants' cashier to be such, which would bring the case within the principle of *Cole* v. *Sackett, Watervliet Bank* v. *White,* (1 *Denio,* 608;) *Waydell* v. *Luer,* (5 *Hill,* 442; 3 *Denio,* 418;) *Highland Bank* v. *Dubois,* (5 *Den.* 558;) *Elwood* v. *Deifendorff,* (5 *Barb.* 398.) If the transfer was not in payment and discharge of the prior indebtedness, as between the parties, and without affirmative evidence of the fact it could not be presumed, then it was not a transfer in payment so as to cut off the equities of third persons. I have met with no case in our own courts in which a transfer of commercial paper has been held to have been in payment of an existing debt so as to affect the parties to the paper transferred, as the persons claiming title to it, in which it was not in fact payment as between the parties to it. It is possible that the convenience and security of those dealing in commercial paper require that the law as held in this state should be somewhat modified, and perhaps be made to conform to the opinion of Justice Story, in *Swift* v. *Tyson,* (16 *Peters,* 1;) but if this be so held it can only properly be done by the court of last resort, who can alone authoritatively review and modify the decision of the court for the correction of errors.

The decisions in our own state are not, I think, inconsistent with each other, and with the exception of the case of *White* v. *Springfield Bank,* (3 *Sandf. S. C. R.* 222,) there has been no attempt to detract from the force of the case of *Coddington* v.

*Bay*, (20 *John.* 636,) or the leading opinion of the chancellor in *Stalker* v. *McDonald*, (6 *Hill*, 93.) In *Coddington* v. *Bay* the notes were transferred to the defendants to indemnify them against responsibilities already incurred for the party transferring them. Chief Justice Spencer says, " Now I understand by the usual course of trade, not that the holder shall receive the bills or notes thus obtained as securities for antecedent debts, but that he shall take.them in his business and as payment for a debt contracted at the time." If the judge was right in his conclusion, as I think he was, that the drafts in question were not transferred in payment, absolutely, of the prior indebtedness of Osborn, Turnbull & McDonald, they were of course received as security, and the case is directly within *Coddington* v. *Bay*.

The next case was that of *Wardell* v. *Howell*, (9 *Wend.* 170,) and there the note was transferred as collateral security for a prior debt, and in consideration of its receipt the plaintiff discontinued a suit which he had commenced against the debtor, and gave him time. This was not held a sufficient giving up or parting with any valuable right or thing to give the party the rights of a *bona fide* holder for value. In *Rosa* v. *Brotherson*, (10 *Wend.* 85,) the question was directly presented, and it was expressly decided that when a creditor receives the transfer of a negotiable note in payment of a precedent debt, he takes it subject to all equities existing between the original parties. In this case it did not appear that any security was given up. Chancellor Walworth says, in *Stalker* v. *McDonald*, that there is no doubt that *Rosa* v. *Brotherson* follows the decision of *Coddington* v. *Bay*. In *Payne* v. *Cutler*, (13 *Wend.* 605,) the notes were transferred and the value of them allowed on a settlement of accounts with the payee, and it was held that the holders were not holders for value, and that the consideration was inquirable into in an action by them against the maker. Chief Justice Savage says, " The plaintiff in this case neither having advanced any thing nor incurred liability on the credit of these notes, we must on this motion assume that the notes were obtained by fraud, and the defense was therefore proper." *Francia* v. *Joseph*, (3 *Edw. Ch.* 182,) was, like this, an equi-

table claim to recover possession of a promissory note which, as was alleged, had been fraudulently diverted from its proper use, and the defendant had received it as security for a precedent debt, of one who held it as the agent of the plaintiff, and had on receiving it given up another note made by a third person, which had been deposited with them as security for the same debt, and their title was declared invalid as against the claims of the rightful owner of the note. *The Bank of Salina* v. *Babcock,* (21 *Wend.* 499,) was decided upon grounds which were supposed to make the case an exception to the general rule, and was not considered by the court pronouncing it as overruling any of the antecedent cases in our own courts. The court held that the plaintiff did pay value for the note in the strict sense of the term. Ch. J. Nelson says, "The proceeds of the note were placed to the credit of Trowbridge & Co. for whom it was discounted and were drawn out; not, I admit, by checking for the money, but by the *cancellation* of securities held by the plaintiff, which was the same thing in legal effect. By this cancellation a responsible indorser had been discharged, or if not discharged, the remedy against him had been rendered doubtful. Upon this distinguishing feature of the case the decision is rested." *The Bank of St. Albans* v. *Gilliland,* (23 *Wend.* 311,) was put upon the ground that the note was taken by the plaintiff in full *satisfaction of the prior indebtedness, without recourse and the debt discharged.* The court, in giving judgment, reaffirms the doctrine that "receiving a note for a *precedent debt* is not receiving it for value, within mercantile usage," and refers approvingly to the cases sustaining the doctrine. The plaintiff had discharged the personal responsibility of the original debtors on the credit of the note, and had thus parted with value. The decision in the case of *The Bank of Sandusky* v. *Scoville,* (24 *Wend.* 115,) is placed by the court upon the same principle. Bronson, J., says, "The note was *discounted* by the plaintiff for the benefit of Ward to extinguish his debt, and the avails went to *discharge* his liability to the bank." Emphasis is laid upon the fact that a debt was "extinguished," and a personal liability of the original debtor "discharged." *The Mohawk Bank* v. *Corey,* (1

*Hill,* 513,) was an action against the defendant as the indorser of the note of one Borst, which had been transferred to the plaintiff in *payment* of two notes of the same maker, indorsed by one Voorhees, which were delivered up, and a suit which had been · commenced was thus discontinued. The court held, 1st, that there had been no diversion of the note from the purpose for which it was made and indorsed ; and 2d, that if there had been, the plaintiffs would still be entitled to recover as *bona fide* holders for value, within the principle of *The Bank of Salina* v. *Babcock.* Securities had been given up. *Stalker* v. *McDonald,* (6 *Hill,* 93,) affirms a judgment of the supreme court, to the effect that the holder of negotiable paper would not be protected as against the equities of third persons when it appeared that the paper was received as a security for an antecedent debt, and the holders neither parted with value on the credit of it, nor relinquished any previous security. This is probably the extent to which the case goes as authority ; but the chancellor, whose opinion is entitled to great weight, expresses the opinion that it would be the same if the paper were received nominally as payment. He does this upon a full review of all the cases, English and American, and giving to the cases in the 21st and 24th Wendell their full effect as deciding correctly the questions presented by them under the circumstances disclosed. *Small* v. *Smith,* (1 *Denio,* 583,) was somewhat similar in its circumstances to this case, omitting what was done by the defendants at their banking house after the transaction between them and Osborn had been consummated, and in the absence of the latter. The plaintiff had a debt against the maker of the note in suit, and pressed him for security, and agreed to take his note at one year, indorsed by the defendant, and the note was procured and delivered accordingly. Judge Beardsley, in delivering the opinion of the court, held that it was error in the circuit judge to submit to the jury whether the note was received in satisfaction of the prior indebtedness, as there was no evidence tending to show that fact. The case was decided upon another point.

*The Seneca County Bank* v. *Neass,* (5 *Denio,* 329,) simply recognizes the principle that the *satisfaction* of a precedent

debt may form a valuable consideration for the transfer of nego-
tiable paper; but the case was decided upon another ground,
and the question now presented was not considered by the court.
*White* v. *The Springfield Bank,* (1 *Barb. Sup. C. R.* 225,)
was not a well considered case, and under the circumstances, if
they appeared upon that motion as they were developed upon
the hearing of the case upon the merits, the decision might
well have been different, and yet been consistent with all the
cases that had gone before it. *Stewart* v. *Small,* (2 *Barb.
Sup. C. R.* 559,) decided that a person could not be said to
have parted with value for a note when he had only given credit
for the amount of it upon the note of an insolvent party, which
he knew to be of no value; and that is all that has been done
by the defendants in this action, upon the credit of the drafts
which they claim to retain and enforce against the plaintiffs.
The case cited was decided by Judges Cady, Willard and Ed-
monds, and the argument of Judge Cady was entirely applicable
to the points of this case. In *Montross* v. *Clark,* (2 *Sand. S.
C. R.* 115,) the note in suit was transferred to the plaintiff in
part payment of a note they held against the payee, and Judge
Sandford instructed the jury that if the note had been diverted
from the purpose for which it was made by the defendant, and
lent to the payee, the plaintiffs could not recover. Thus directly
affirming the doctrine of *Rosa* v. *Brotherson,* and the other
cases cited. Of course what Vanderpoel, J., said upon this
point, the plaintiff having recovered, is entirely *obiter,* and the
remark was not as well considered as it would have been if it
had been material to the case. *Spear* v. *Myers,* (6 *Barb.* 445,)
was decided by Judges Jones, Edmonds and Edwards, and dis-
tinctly reaffirms the doctrine of *Rosa* v. *Brotherson,* that par-
ties who receive a note which has been improperly put in circu-
lation, in payment of an existing debt, without parting with any
value for it at the time, or surrendering any securities, are not
entitled to hold it, as against the rightful owner. The plaintiffs
had received the note from Knapp, their debtor, in payment of
their debt, gave him a receipt for it, and balanced the accounts
on the books. This is certainly as much as was done by the

defendants here, for their canceling iron was of no more force,
applied to the papers, than was the receipt given to the party.
Both acts are open to explanation. ( *Watervliet Bank* v. *White*,
1 *Denio*, 608.) *White* v. *The Springfield Bank*, which was
before Judge Edmonds in 1 *Barbour*, was before the superior
court of the city of New York, on its merits, and is reported in
3 *Sand. S. C. R.* 222. The case was one of an absolute dis-
charge of a precedent debt, and also one in which the defendants
having collateral securities to a given amount and which covered
the draft given up on the receipt of the note of the plaintiffs,
made other advances in lieu of the advance made upon the draft,
and which further advances fully exhausted the collaterals, so
that the defendants made a case of very strong equity. By
acting upon the faith and credit of the plaintiff's note they had
parted with value, and unless permitted to retain the note, they
would be the losers to the full amount. But in this case the
defendants are in as good a situation, if they are compelled to
surrender the bills indorsed by the plaintiffs, as they would have
been if they had never taken them. They parted with nothing,
and if they can collect the drafts, they are by so much the gainers
by the experiment

*Youngs* v. *Lee*, (18 *Barb.* 187, *affirmed* 2 *Kernan*, 551,) was
well decided, in accordance with the previous decisions by the
courts of this state. In consideration of the note in suit, the
plaintiff had withdrawn from the bank another note of the party,
before it reached maturity, and surrendered it to the maker on
receiving from him a new note payable in three months, indorsed
by a third person. In other words, they had taken the note
sued on, in satisfaction of a debt not yet due, and surrendered
the evidence of that debt. The decision in the court of appeals
was put upon this ground alone. Judge Johnson says, " In the
case before us the note was received in extinguishment of a de-
mand upon a note not yet due, and the note was delivered up.
The surrender upon the consideration of a security not due extin-
guished the security. The plaintiffs therefore became holders
for value, and are entitled to recover."

There was nothing in this case like the surrender of any se-

curity by the defendant, upon receiving the drafts indorsed by the plaintiff. The transaction, as between them and Osborn, was complete when the latter delivered to them the drafts. No other act was necessary, or was contemplated, to vest the title to the drafts in them, and they were then the holders of both sets of securities. The one was therefore collateral to the other, as found by the judge. The subsequent acts of the defendants were performed of their own volition, and not at the request or for the benefit of any third party, or in performance of any part of the agreement under which they acquired title to the paper. Their own acts cannot be resorted to to fortify their own title. They were, however, of no legal importance, even if done with the knowledge and assent of Osborn. The equities of the plaintiff are very manifest, and the defendant has failed to show a legal title to the drafts which can overcome them. The objection to the evidence of what passed between Osborn and the plaintiff at the time the indorsements were procured, is clearly untenable. The gist of the action, and the foundation of the plaintiff's equities, is the false and fraudulent representations of Osborn; and to shut out the evidence of the declarations of Osborn would be simply to debar the injured party of all relief. The complaint does not necessarily mean that the representations were made in the presence of the defendants' cashier, and if it did, that part of the averment would be immaterial, so far as the case upon which relief was finally granted is concerned, and might well have been disregarded or considered as struck out as surplusage. The proof offered, of the purpose for which the drafts remained in the possession of the defendant after the 19th day of January, 1856, was inadmissible, as only tending to show the understanding of the defendant of the agreement and the resulting legal rights of the parties, and this too after *lis mota* the practical construction of the agreement by the defendants after suit brought. The offer of the defendant to contradict Osborn as to an immaterial fact, to wit, the circumstances attending another transaction, a prior loan from the defendants of $5000, with which the plaintiff was not connected, was properly excluded. As to that matter the defend-

ants had made Osborn their own witness, and were not allowed to contradict him by way of impeachment. So too, the evidence offered that the witnesses for the defendant refused to swear, in the affidavit which was introduced with a view to discredit him, to something much more favorable to the defendant and much more discordant with his evidence on the trial than was actually sworn to by him in the affidavit, was not competent, as it did not explain the facts stated in the affidavit, or tend to qualify them or explain or account for the discrepancy, if any existed, between the statements in the affidavit and the evidence given on the trial.

These are all the questions, and all the exceptions, which were made by the counsel for the defendants in his printed points or presented by him upon the argument; and I am unable to discover any error calling for a reversal of the judgment. The judgment must be affirmed with costs.

BACON, J. That the name of the plaintiff was procured to be placed upon the paper in question by gross fraud and misrepresentation is transparent upon the evidence, and is found by the justice before whom the trial took place. The only important question is whether it was received by the defendant in good faith and in the usual course of business, and whether the bank parted with securities, or extinguished an antecedent indebtedness; or whether it was received only as collateral security and the indebtedness remained undischarged. The judge has found as a matter of fact that there was no agreement between Pomeroy and Osborn, that the drafts in question should be received by the defendant in payment of the prior drafts then under protest, but that on the part of Osborn they were delivered with the intention that they should be held as additional and collateral security to the indebtedness then existing in favor of the defendant. This conclusion is one drawn from the evidence in the case, and it seems to me it is conclusive as to the respective rights of the parties. The law is well settled, after a long series of adjudications in this state, that where paper thus obtained in fraud of the party executing it, is parted with to an innocent

---

The People *v.* Medical Society of the County of Erie.

---

holder, in the usual course of trade, for a valuable consideration, such holder will be protected. But the valuable consideration must be either a new advance made at the time, or some prior security must be parted with, or an existing indebtedness actually discharged, in order to complete the title of the holder. See *Stalker* v. *McDonald,* (6 *Hill,* 93,) following and reaffirming the decision in the case of *Coddington* v. *Bay,* (20 *John.* 636,) and numerous cases since. Merely giving this the form of canceling the old drafts and still retaining them, was no discharge of the securities, nor did it exonerate the parties thereon from liability. But the finding of the court that the drafts indorsed by the plaintiff were delivered merely as collateral security, in my judgment puts an end to the question.

I see nothing in the several objections made in the course of the trial, and the rulings thereon, which requires notice; and upon the whole case my opinion is that the judgment should be affirmed.

HUBBARD, J., and PRATT, J., concurred.

Judgment affirmed.

[JEFFERSON GENERAL TERM, April 7, 1857. *Hubbard, Pratt, Bacon* and *W. F. Allen,* Justices.]