(26 Misc. Rep. 480.)

BREWSTER et al. v. SHRADER.

(Supreme Court, Special Term, Monroe County. February, 1899.)

1. BILLS AND NOTES—BONA FIDE HOLDER—INDORSEMENT—CONSIDERATION.
Under the negotiable instruments law (Laws 1897, c. 612, § 51), which provides that a pre-existing debt constitutes a sufficient consideration, an indorsee of a note taken as collateral to a pre-existing indebtedness is a holder for value, unaffected by equities between the original parties.

2. SAME—NOTICE OF DISHONOR—DILIGENCE—QUESTION FOR JURY.
The indorser of a note conducted a business in S., where a notice of dishonor was mailed to him in an envelope bearing the plaintiff's return card. The indorser, who resided in a suburb of S., and received his mail there,

testified that he did not receive the notice; but it appeared that the notice was not returned to plaintiff, according to custom. *Held*, that it was for the jury to determine whether plaintiff exercised sufficient diligence in giving the notice.

Action by John H. Brewster and others against Henry Shrader. Defendant moved for a new trial. Denied.

G. W. Cole, for the motion.
Hiram R. Wood, opposed.

WERNER, J. The facts in the case are not controverted. The action is brought to recover upon a promissory note made by Sarah Doyle, and indorsed by the defendant. The note bears date May 20, 1898. It was for $212.54, and is payable three months after date. The note was given as collateral security for the payment of an indebtedness from said Sarah Doyle to the plaintiffs, for goods previously sold and delivered, and which was due when said note was given. No express agreement for an extension of time of payment was made when said note was given. The defendant testifies, without contradiction, that prior to the execution of the note in suit, the husband of said Sarah Doyle requested the defendant to indorse a note for $65, upon which one Patrick Nary had agreed to become a prior indorser, and which was to be discounted at the First National Bank of Salamanca. That the defendant indorsed the note in suit upon the express condition that it should be discounted at said bank, and that it should not be used until said Patrick Nary had indorsed it. Said Nary never indorsed said note, and he testifies that he never agreed to indorse it. The plaintiffs had no knowledge of the alleged representations of Doyle as to the indorsement of Nary. The defendant lives in West Salamanca, which is about two miles west of Salamanca, the place at which said note is dated. He is in the milk business, and delivers milk in Salamanca, practically every day in the year. A notice of protest, addressed to the defendant at Salamanca, was seasonably mailed by the plaintiffs at Rochester. It appears that this notice was mailed in an envelope bearing the "return" stamp of the plaintiffs, and the postal clerk at Salamanca testifies that, according to the usual custom of that office, said envelope, if not delivered or called for, would, in due course, be returned to the sender. It also appears that the defendant had a letter box in the post office at West Salamanca, through which he obtained all his mail, and that he never received any mail through the post office at Salamanca. Upon these facts, the defendant contends: First, that the plaintiffs are mere holders of collateral security, for an antecedent debt, and not entitled to recover, as against an indorser, in fraud of whose rights this security has been diverted from the purpose for which it was given; second, that no sufficient notice of nonpayment of said note was ever served upon him, and that plaintiffs have not excused their failure in this regard by showing due diligence.

It may be assumed, for the purposes of this argument, that if chapter 612, Laws 1897, known as the "Negotiable Instruments

Law," has not changed the rule laid down in Coddington v. Bay, 20 Johns. 637, and subsequent kindred cases, upon which the defendant relies, it was error for the court to decide, as a question of law, that the plaintiffs were holders for value. Prior to the enactment of said law, it was the well-settled rule in this state that one who receives a promissory note as collateral security, merely, for an antecedent debt, cannot enforce such note against a maker or indorser thereof, when the same has been obtained by fraud, or has been fraudulently diverted from the purpose for which it was made. Coddington v. Bay, supra; Insurance Co. v. Church, 81 N. Y. 218; Farrington v. Bank, 24 Barb. 554; Bank v. Ewing, 131 N. Y. 506, 30 N. E. 501; Moore v. Ryder, 65 N. Y. 438; Benjamin v. Rogers, 126 N. Y. 60, 26 N. E. 970.

Plaintiffs' contention that the taking of the note was in itself an agreement to extend the time of payment, and, therefore, constituted them holders for value, cannot be sustained, in the light of Cary v. White, 52 N. Y. 138, and other cases there cited. In the absence of an express agreement to extend the time of payment of the original debt, or a new and substituted agreement between the parties, the pre-existing obligation remains in full force. The note which was taken as collateral security was entirely independent of it. The doctrine in Iron Co. v. Walker, 76 N. Y. 524, cited by plaintiffs, is not in conflict with these views. The operation of every note is to extend the time of payment until it becomes due. But this has reference only to the note, and not to the original debt. Has section 51 of the "Negotiable Instruments Law" changed the rule in the leading case of Coddington v. Bay, supra, and the cases which have followed it? We think it has. Said section reads as follows:

"Consideration, What Constitutes.—Value is any consideration sufficient to support a simple contract (a). An antecedent or pre-existing debt constitutes value; and is deemed such whether the instrument is payable on demand or at a future time (b)."

The language of this section, when given its usual and ordinary signification, ought to leave no room for doubt upon the subject. There is, however, such a universal disposition among lawyers to look for some hidden or subtle meaning in the most simple language, that it has become quite the fashion to require the courts to construe statutes which, to the average lay mind, seem to require no construction. If the language of the section under consideration were not obviously clear and unequivocal, and there were need of ascertaining the legislative intent in order to give proper effect to such language, the history of the subject, of the judicial decisions in England and the states of this country, and of the proceedings of the commission on uniformity of laws, leave no possible doubt as to the purpose of this section. It is a fact known to every lawyer that the diversity of laws and judicial decisions which obtains in the several states of our Union is a source of great inconvenience in practice, and a standing menace to the proper administraton of justice. So apparent has this evil become that many of the states have taken steps to secure, if

possible, a uniformity of those laws in which all have a common interest. Among the more important of these laws are those relating to negotiable instruments. Since 1822, when the case of Coddington v. Bay was decided by our court of errors, the decisions of our courts have been at variance with those of the courts of England and of the United States upon the question whether a person receiving negotiable paper as security for an antecedent or pre-existing debt, but without notice of facts which would vitiate such paper as between the antecedent parties, is a holder for value. In this state the rule has been that such a holder is not a holder for value, within the meaning applied to that term by the law merchant. Coddington v. Bay, supra, contains the leading exposition of the rule, and has been followed in Insurance Co. v. Church, 81 N. Y. 218; Farrington v. Bank, 24 Barb. 554; Bank v. Ewing, 131 N. Y. 506, 30 N. E. 501; Moore v. Ryder, 65 N. Y. 438; Benjamin v. Rogers, 136 N. Y. 60, 26 N. E. 970, and many other cases. The difficulty of applying this rule to holders of negotiable paper acquired in the regular course of commercial dealings has led to great confusion and many subtle refinements, in the decisions of this state. These were sought to be removed by the decision in Bank v. Penfield, 69 N. Y. 503, in which it was held that:

"Where a promissory note is made for the accommodation of the payee, but without restriction as to its use, an indorsee, taking it in good faith as collateral security for an antecedent debt of the payee and indorser, without other consideration, occupies the position of a holder for value, and can recover thereon against the maker. The precedent debt is a sufficient consideration for the transfer, and no new consideration need be shown. It is only where the note has been diverted from the purpose for which it was intended, by the payee, or where some other equity exists in favor of the maker, that it is necessary that the holder should have parted with value on the faith of the note, in order to enforce the same."

This was the law of this state down to the 1st day of October, 1897, and is the law to-day if the negotiable instruments law has not changed the rule in reference to negotiable paper affected by fraud or equities between the original parties, without the knowledge of the holder seeking to enforce the same. The courts of England and our federal courts have held that a bona fide holder of a negotiable instrument, who takes the same in payment of, or as security for, an antecedent debt, is a holder for a valuable consideration, entitled to protection against all the equities between antecedent parties. In Railroad Co. v. National Bank, 102 U. S. 26, the supreme court of the United States, in an exhaustive opinion by Mr. Justice Harlan, squarely adopted the view that the taking of a note in payment of, or as collateral security for, a pre-existing debt, constitutes the holder thereof a holder for value in the usual course of business. In the discussion of this proposition, the court says:

"One of the grounds upon which some courts of high authority refuse, in such cases, to apply the rule announced in Swift v. Tyson, 16 Pet. 1, is that transactions of that kind are not in the usual and ordinary course of commercial dealings. But this objection is not sustained by the recognized usages of the commercial world, nor, as we think, by sound reason. The transfer of

negotiable paper as security for antecedent debts constitutes a material and an increasing portion of the commerce of the country. Such transactions have become very common in financial circles. They have grown out of the necessities of business, and, in these days of great commercial activity, they contribute largely to the benefit and convenience both of debtors and creditors. * * * Another ground upon which some courts have refused to sanction the rule announced in Swift v. Tyson is that, upon the transfer of negotiable paper merely as collateral security for an antecedent debt, nothing is surrendered by the indorsee; that to permit the equities between prior parties to prevail deprives him of no right or advantage enjoyed at the time of transfer, imposes upon him no additional burdens, and subjects him to no additional inconveniences. This may be true in some, but it is not true in most, cases; nor, in our opinion, is it ever true when the note, upon its delivery to the transferee, is in such form as to make him a party to the instrument, and impose upon him the duties which, according to the commercial law, must be discharged by the holder of negotiable paper in order to fix liability upon the indorser."

In 1882 the English parliament passed "An act to codify the law relating to bills of exchange, cheques and promissory notes." The language of section 27 of that act is, in substance, the same as that of said section 51 of the New York act. The English act contains the word "liability" after the word "debt," but this does not alter the meaning of the section. In 1890 the legislature of this state passed "An act to provide for the appointment of commissioners for the promotion of uniformity of legislation in the United States." Laws 1890, c. 205. The duty of this commission was to "examine the subjects of marriage and divorce, insolvency, the form of notarial certificates and other subjects"; to ascertain the best means to effect an assimilation and uniformity in the laws of the states, and especially whether it would be wise and practicable for the state of New York to invite other states of the Union to send representatives to a convention to draft uniform laws to be submitted for the approval and adoption of the several states, and to devise and recommend such other course of action as shall best accomplish the purpose of this act. In 1891 said commission made a report to the legislature. In 1895 a conference of commissioners from a large number of states was held in Detroit. At that conference the committee on commercial law was instructed to prepare a codification of the law of bills and notes. This committee, in turn, referred the matter to a subcommittee, the members of which employed Mr. John J. Crawford, of New York City, to draft the proposed law. The bill prepared by him has become a law in this state (Laws 1897, c. 612), and the states of Connecticut, Colorado, and Florida. The author of this law says, in his annotated publication of the same, that section 51 thereof was designed to change the rule laid down in Coddington v. Bay, supra. James W. Eaton, Esq., instructor on the law of bills and notes in the Albany Law School, in his published edition of the New York law, in a note to section 51, says: "It is to be inferred that the above statute extends the New York rule to include instruments given merely as collateral security." It seems evident, therefore, from the history of this subject, as well as from the obvious purpose for which this statute was enacted, no less than from the language of the statute itself, that

the New York rule, so called, has been modified so as to conform to the rule in England and in our federal court of last resort. We have discussed this question at such great length, because we have been unable to find any reported case in which it has arisen. Under the views above expressed, plaintiffs must be regarded as holders for value, whose title to the note in suit is unaffected by any existing equities between antecedent parties. Upon the uncontradicted evidence on that branch of the case, it was properly treated as a question of law.

The second question in the case may be very briefly disposed of. It is concededly a close question, upon the facts of this case, whether the plaintiffs exercised the "reasonable diligence" required by the statute in sending notice of dishonor of the note in suit to the defendant. But we think this question was properly submitted to the jury as a question of fact. Reasonable diligence is all that law requires. The law does not exact every possible exertion which might have been made to effect notice of the dishonor of the paper. Bank v. Darling, 91 Hun, 236, 36 N. Y. Supp. 153. What is reasonable diligence depends upon the circumstances of each case. In this case the plaintiffs were informed that the defendant was the proprietor of a milk route, which was, in fact, true. It appears that this route is in the village of Salamanca, and that defendant is in said village substantially every day. West Salamanca, although it has a separate post office, seems to be but a suburb of Salamanca. After receiving notice from the bank in Salamanca that the note had not been paid, the plaintiffs had until the evening of the following day in which to send notice to the defendant. The question of what is reasonable diligence must be determined with reference to what would have suggested itself as necessary, under the existing circumstances, to the man of ordinary prudence and intelligence. Plaintiffs were not called upon to assume that the note would not be paid at maturity. The acts done by the plaintiffs, supplemented by the failure to return the notice sent by them pursuant to the direction upon the envelope in which the notice was contained; and the denials by the defendant that he ever received such notice, and his proof that he received all his mail at West Salamanca, and none at Salamanca,—established conditions under which men might reach different conclusions upon the question whether the plaintiffs had exercised due diligence or not; and, therefore, we think it was a question for the jury. Defendant's motion for a new trial is denied, with $10 costs.

Motion denied, with $10 costs.